MISSOURI PACIFIC TRANSPORTATION COMPANY v. KINNEY.

4-5685 135 S. W. 2d 56

Opinion delivered December 18, 1939.

*Huie & Huie* and *House, Moses & Holmes,* for appellant.

*Hugh Gordon Holcomb, Jr., James Robertson* and *J. H. Lookadoo,* for appellee.

HOLT, J. Appellants bring this appeal from a judgment of the Clark circuit court on a jury's verdict, in the sum of $8,000, in favor of appellee, for injuries alleged to have been sustained by him while a passenger on a motor bus of appellant, Missouri Pacific Transportation Company.

This record reflects, according to appellee's testimony, that he, Ralph Kinney, at about five o'clock on the afternoon of July 1, 1938, boarded appellants' bus at Brinkley, Arkansas. He walked down the aisle, which was about fourteen inches wide, toward the rear, looking for a seat. As he did so, the bus driver, J. H. Rampey, one of the appellants, followed close behind him within about two feet, carrying a suitcase in front of him at an angle of about forty degrees, and just as appellee was in the act of taking a seat the bus driver attempted to lift and swing the grip up into a rack on the side of the bus. In doing so, the grip, which was about twenty-four inches long, struck the rear part of the right arm of appellee just above the elbow, bruising the arm and causing an injury to the ulnar nerve.

A Mr. Crawford, witness for appellee, testified that he had gone to the bus station at the time appellee was injured to confer with appellee on a matter of business,

He saw appellee board the bus, walk down the aisle toward the rear and just as appellee turned to take a seat he saw the bus driver strike appellee's elbow in the manner as described by appellee. "A. Yes, he started to throw it up on the rack and it struck Mr. Kinney on the right arm—somewhere about the elbow." This witness was standing on the curb within a few feet of the bus and saw him clearly through the window.

On the morning following the injury, July 2, appellee was examined by Dr. Stewart, a physician in Wynne, who testified that upon examination he found appellee's elbow discolored and bruised. He X-rayed the arm but found no fracture but did find the ulnar nerve bruised. He put appellee's arm in a sling and used antiseptic treatment to draw the soreness and swelling out of the arm. He treated appellee at different times up until the day of the trial, and "Q. Taking into consideration the time he received the injury, the first day of July, 1938, and the condition it is in now, in your opinion, is that injury and condition to this arm permanent? A. It looks mighty badly like it. Q. It looks like it is a permanent injury? A. Yes. Of course, there is a chance that it might improve, but it had not improved in several months. . . . I am not a nerve specialist or a bone specialist and I don't pose as one."

Dr. F. W. Carruthers, a nerve and bone specialist of Little Rock, is the principal witness relied upon by appellee as to the nature and extent of his alleged injury, and he testified that appellee came to him for treatment and that he gave him a thorough examination with the following findings: "A. . . . This examination revealed that the hand had a reddish, bluish appearance and the tactile examination for pains demonstrated that there was an area of anathesia following the course of the ulnar nerve over its distribution of the lateral aspects of the arm down to the ring and little fingers. There is no motor disturbances to this nerve. My opinion is that this is a traumatic neuritis and I advised him to have an exploratory operation in order to free this nerve from around its bed of adhesions and where he sustained the blow to a bed of soft tissue for the nerve."

Dr. Carruthers operated on September 27th and "I found scar tissue covering over the nerve where it passes through the area of the elbow overlying the humerus. There was definitely a path of adhesions which was where I freed the nerve and lifted it up and placed it in a soft bed by transplantation of the soft tissue in the bottom bed. The wound closed without drainage and the arm was immobilized. Since the operation, Mr. Kinney came to my office for several months using physio-therapy treatments. Q. Doctor, what effect did the injury you found to this ulnar nerve in his right arm have on his arm? A. This scar tissue that is found binding the nerve down *could have* produced both motor and sensory disturbances, because the ulnar nerve is both a motor and sensory nerve, but tests with an electric machine and by nerve degeneration, it responded to stimilae of electricity, which showed motor functions. This scar tissue was definitely binding the nerve; it evidently only involved the sensory side of the nerve. . . . There is more or less of what we call a sympathetic disturbance that naturally goes along with that and that would cause impairment in the motor side of the nerve. That, of course, is mental because of the disturbance of the sensory nerve itself."

Dr. Carruthers further testified: "Q. He had no injury except to the ulnar nerve? A. That is all I found. . . . Q. But the nerve does not stick to the sheath, does it? A. You mean to the nerve filament? Q. That's right. A. No, they are not adhered to the sheath. . . . Q. Where was the scar tissue with respect to the sheath? A. Right on top of it. Q. And what you did was to take it off? A. Yes, sir. . . . Q. That sheath wasn't broken, was it? A. No. Q. And the nerve was not broken? A. No. Q. And the motor nerve was not damaged? A. No, I tested that out. . . . Q. There wasn't anything wrong with any of the nerves except the ulnar nerve, was there? A. Yes. Q. And there wasn't anything wrong with that except the scar tissue and you removed the scar tissue? A. Yes. . . . Q. It is not an unusual operation? A. It is not an unusual operation, no. . . . Q. Have you observed whether or not Mr.

Kinney has lost any weight? A. No, I couldn't say I have observed that. . . . Q. Have you examined him to know what his nervous conditions are? A. No, I have not. . . . Q. Now, Doctor, is he anything like well yet? A. No, sir. Q. Could you tell with any degree of accuracy when he would be well? A. No, I couldn't state with any degree of accuracy when he would be. Q. Or whether he ever will be well? A. No, sir.''

Appellee Kinney further testified: ''Q. What did he (Dr. Stewart) do for your arm? A. He had me go home and put hot packs on it. . . . Dr. Stewart sent me to Dr. Carruthers in Little Rock . . . sometime in September. . . . Q. Tell the jury whether or not it is better now than it was four or five months ago? A. It is not. The feeling in the bottom part of my hand plumb numb and dead before the operation—it has more feeling now, but no more use. Q. Can you use it at all? A. I can use it some, yes, sir. . . . Q. You don't claim and haven't claimed at any time that you had anything wrong with your arm except that you had a tingling feeling in your arm and pain in the forearm and hand? A. There is quite a bit of numbness there. Q. The numbness was just numbness that comes from striking your funny bone, wasn't it? A. I don't know. Q. You have had that many times? A. Not like this. Part of my arm was just dead and didn't have any feeling in it. Q. For how long? A. I would say two months. Q. Two months? A. Yes, sir. Q. Had the numbness gotten over with at the time you saw Dr. Carruthers? A. No, it was continually getting worse all the time. Q. And when he operated on your arm, it went away? A. No, it hasn't all went away, but it has more feeling than it did. Q. In other words, as far as the numbness is concerned, it is getting better? A. You can feel those fingers (indicating) and before, you couldn't feel at all.''

Appellee Kinney also testified as to his earnings before and after the alleged injury. ''Q. In 1936 you didn't say that you and your partner together made as much as twenty-five hundred ($2,500) dollars? A. I said around that. Q. And in 1937 you said you made

around five thousand dollars ($5,000)? A. Yes. Q. And in 1938 in the springtime, you made more than five thousand dollars ($5,000)? A. 1938 hasn't been gone very long. Q. Most of that was made in the spring? A. No, sir. Q. When was it made? A. Along through the summer. Q. In the spring and summer? A. Yes, the bigger part of it. Q. And your business for 1939 is just opening up? A. That's right."

Doctors testified on behalf of appellants, two of whom being specialists on nerve and bone injuries. One a partner in the Campbell Clinic of Memphis, testified positively that there was nothing wrong with plaintiff's arm and elbow, no symptoms indicating any injury to the ulnar nerve, and that in his opinion appellee's arm was normal in every particular.

On this state of the record appellants insist (1) that there is no substantial evidence to go to the jury and that, therefore, the trial court erred in refusing to give a peremptory instruction in their favor; and (2) they contend that the verdict is excessive.

On the first assignment it is our view that when the testimony is considered in its most favorable light to appellee that it is sufficient to take the case to the jury. The question of negligence of appellant's bus driver and the contributory negligence of appellee were clearly on this record within the province of the jury to determine and were submitted under proper instructions. We conclude, therefore, that appellants' first assignment cannot be sustained.

Appellants' next contention that the verdict of $8,000 is excessive, is well taken and must be sustained.

In the instant case the trial court instructed the jury, over the objections and exceptions of appellants, to assess such damages as would reasonably compensate appellee for "the physical pain and mental anguish suffered and endured by him in the past, if any, and that which he will endure in the future," "the effect of the injury on his health," "pecuniary loss from his diminished capacity for earning money through life, if any."

Before such a recovery can be allowed, the permanency of the injury must be made to appear from the

evidence with reasonable certainty and that future pain and suffering are inevitable and if they appear to be only probable or uncertain they cannot be taken into the estimate.

In the case of *St. L. I. M. & S. Ry. Co.* v. *Bird,* 106 Ark. 177, 153 S. W. 104, the rule is clearly stated by this court in the following language: "The testimony, viewed in the strongest light in favor of appellee, does not make it reasonably certain that Wharton Bird was permanently injured. Unless there is testimony tending to show with reasonable certainty that the injury is permanent, the court should not permit the jury to assess any damages for permanent injury. *A. L. Clark Lumber Co.* v. *St. Coner,* 97 Ark. 358, 133 S. W. 1132. See, also, *Ark. & La. Ry. Co.* v. *Sain,* 90 Ark. 278, 119 S. W. 659, 22 L. R. A., N. S. 910; 13 Cyc. 144, and cases cited.

"Mr. Hutchinson says: 'The jury may take into consideration future as well as past physical pain and suffering; but to justify them in doing so it must be made reasonably certain that such future pain and suffering are inevitable, and if they be only probable or uncertain they cannot be taken into the estimate.' 3 Hutchinson on Carriers, § 805, and cases cited; *Chicago, Rock Island & Pac. Ry. Co.* v. *Archer,* 46 Neb. 907, 65 N. W. 1043; *Smith* v. *Milwaukee Builders & Traders' Exch.,* 91 Wis. 360, 64 N. W. 1041, 30 L. R. A. 504, 51 Am. St. Rep. 912.

"The experts on behalf of appellee did not testify that, in their opinion, the injury to Wharton Bird was permanent. It was a matter of speculation with them as to whether it was permanent or not. This being true, it must also have been a matter of conjecture with the jury. But to fulfill the requirements of the law there must be affirmative testimony to the effect that the injury was permanent before the jury would be authorized to find that such was the fact; and the court should not allow the permanency of the injury to be considered as an element of damage, where the witnesses themselves are uncertain as to whether there would be any

permanent injury, and where the nature of the injury, *per se,* does not show that the injury was permanent.''

This rule of law, as announced in the Bird case, has been approved by this court in many cases, among them being the following: *Midland Valley R. Co.* v. *Scoville,* 109 Ark. 29, 158 S. W. 954; *Scullin* v. *Vining,* 127 Ark. 124, 191 S. W. 924; *McCord* v. *Bailey et al.,* 195 Ark. 862, 114 S. W. 2d 840.

It is our view that the testimony in the instant case, when viewed in its most favorable light to appellee, falls short of making it reasonably certain that appellee received a permanent injury and that it is inevitable that he will endure future pain and suffering.

The effect of the testimony of his own doctors, and especially that of Dr. Carruthers, who operated upon appellee and is certainly in the best position of anyone to judge of the extent and effect of the injury complained of, does not show with that degree of certainty required under the above rule, that the alleged injury will be permanent or that there will be future pain and suffering.

The effect of this expert testimony is that the ulnar nerve, which affects only the little finger and part of the ''ring'' finger of the hand, was found to be uninjured and the sheath inclosing it unbroken. The only thing that retarded its functions at all was the scar tissue in which it was found to be embedded and this scar tissue was removed and the nerve released from the binding scar tissue and re-embedded in soft tissues which restored it practically to a normal state.

In view of contentions of appellee that his injury was permanent and that he would be subjected to future suffering, it is apparent that the jury took these elements of damage into consideration, although there is no testimony to sustain a finding of this nature.

While we think the testimony did not warrant the giving of the instruction on permanent injury and future pain and suffering, in the form it went to the jury, any prejudice resulting to appellants may be removed by reducing the judgment to the largest amount the evidence warrants, which we think is $4,000.

If, therefore, appellee will within 15 days from the date of this opinion, remit the amount of damages down to $4,000, the judgment will stand affirmed for that amount, otherwise, the judgment will be reversed and the cause remanded for a new trial.