Tom **WAYCASTER** and Augusta Waycaster, Plaintiffs,

v.

S. P. **SORENSON** and T. T. Colley, Defendants.

**Civ. A. No. 371.**

United States District Court
W. D. Arkansas, Harrison Division.

Oct. 19, 1954.

Willis & Walker, Harrison, Ark., for plaintiffs.

Moore & Villines, Harrison, Ark., for defendant Sorenson.

Wright, Harrison, Lindsey & Upton, Little Rock, Ark., for defendant Colley.

JOHN E. MILLER, District Judge.

## Statement

Plaintiffs filed their complaint against defendants in the Circuit Court of Boone County, Arkansas, and on June 23, 1954, defendants removed the case to this Court.

In due time the defendants each filed separate answers to plaintiffs' complaint, and upon the issues thus joined the case was tried to the Court, without a jury, on September 17 and 18, 1954.

At the conclusion of the trial the case was taken under advisement and counsel for the respective parties were directed to file briefs in support of their contentions. The briefs have been received, and now the Court, having considered the pleadings, ore tenus testimony of witnesses, the deposition of Doctor W. R. Brooksher, exhibits, stipulations and briefs of the parties, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

Plaintiffs are each citizens and residents of Boone County, Arkansas.

The defendant, S. P. Sorenson, is a citizen and resident of the State of Missouri.

The defendant, T. T. Colley, is a citizen and resident of the State of Tennessee.

The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

#### 2.

On May 28, 1952, James Sheppard was driving a trailer truck, owned by the defendant, T. T. Colley, on highway 65 about two miles north of Harrison, Arkansas. As he was driving up a small grade about 6:00 a. m. that morning his truck developed motor trouble and he was forced to stop the truck partly on the east shoulder of the highway and partly on the paved portion of the highway. When the truck was stopped Sheppard placed three flares, one being a pot flare and two being reflector flares, along the highway to warn motorists of the danger. One of the flares was placed approximately 100 feet north of the truck, one was placed 100 feet south

of the truck, and one was placed along the left side of the truck. The flares placed north and south of the truck were each set about a foot east of the center line of the highway.

Soon after the truck became disabled, Jack Shaddox, a man who lived nearby, appeared driving his cows across the highway. Sheppard asked Shaddox if he had anything that could be used to pull the truck off the highway, and Shaddox said that he had a tractor which might do the job. Shaddox obtained his tractor and proceeded to pull the trailer truck up the gradual incline in a northerly direction, evidently with the intention of pulling the truck up into a gravel road that branched off the main highway in an easterly direction. Shaddox succeeded in pulling the truck about 75 feet along the highway and partly into the gravel road, but before it was pulled completely into the said gravel road Shaddox' tractor wheels began to spin in the gravel and he stopped the tractor.

Sheppard and Shaddox both looked at the truck and concluded that it was in a reasonably safe position. Then Sheppard moved the flares, placing them about six inches east of the east edge of the pavement and 100 feet north and south of the truck. After making a phone call, presumably for assistance, Sheppard returned to the truck and went to sleep in the cab.

At that time the truck was located near the top of a small ridge or hill with the cab of the truck to the north. The grade of the hill which the truck had been driven and pulled up was about four per cent, and about 75 feet north of the truck the highway began a decline of three and one-half per cent north and down the ridge or hill. The place where the truck was parked was also in the bend of a five per cent curve, and thus a person driving north on Highway 65 could not see the position of the truck until he or she was within 250 or 300 feet.

The tractor or cab of the truck was in the gravel road that branched off Highway 65 to the east, and the left side of said tractor or cab was six or eight feet from the east edge of Highway 65. The left rear wheel of the trailer was against the east edge of the pavement of Highway 65, and the left rear corner of the trailer body extended approximately 5 inches over the pavement.

3.

On the same morning the plaintiff, Augusta Waycaster, was proceeding in her husband's automobile, accompanied by her son, Jimmy, from Yellville to Huntsville, Arkansas, via Highway 65. She was taking the automobile to her husband, Tom Waycaster, who had requested her to bring the automobile to Huntsville since he wanted to trade automobiles.

About 10:00 a. m. she was driving north on Highway 65 approximately two miles north of Harrison, Arkansas, at a speed of 40 to 45 miles per hour. It had rained earlier that morning, but by 10:00 a. m. the rain had practically stopped and visibility was good. As she approached the place where Colley's truck was parked she was driving up the slight grade and did not see the truck until she was about 250 feet away. She could not immediately ascertain the exact position of the truck, and she began slowing down. Traffic was approaching from the north and from around the curve. The oncoming traffic was apparently in its proper lane on the west side of the highway and she was fearful that she could not safely drive between the oncoming vehicles and the trailer truck parked on the east shoulder of the highway, so she slowed down even more in order to allow the oncoming traffic to pass before she arrived at a point where she would be compelled to stop behind the truck or pass between the parked trailer truck and the oncoming traffic.

4.

In the meantime, the defendant, S. P. Sorenson, had also been driving in a northerly direction on Highway 65 in his 1950 Buick and was about to over-

take the automobile being driven by Mrs. Waycaster. He noticed her automobile and as he drove up within 100 or 150 feet of her he intended to pass her automobile, but upon seeing oncoming traffic he pulled back into the east lane of the highway directly behind the Waycaster automobile. At that time she began to reduce the speed of her automobile and did reduce it to about four or five miles per hour. The defendant, Sorenson, was driving much faster and so closely behind her automobile that he was unable to reduce his speed sufficiently or stop before driving into the rear of the Waycaster automobile.

When Sorenson saw the brake lights of the Waycaster automobile as Mrs. Waycaster began slowing down, he applied his brakes, but as above stated was unable to stop before striking the Waycaster automobile. However, at the time of the impact Sorenson had slowed his automobile considerably and the impact was not too severe, although it was of sufficient force to damage both automobiles.

**5.**

The events that transpired from the time Mrs. Waycaster first saw the parked truck and the time of the collision all happened so quickly that Mrs. Waycaster did not have time to give an arm signal that she was slowing down, nor did she ascertain or know that Sorenson's automobile was directly behind the one she was driving. She merely acted in accordance with her best judgment under the conditions then existing.

**6.**

After the impact occurred, the automobiles came to rest within a few feet of each other. The front end of Sorenson's automobile was very slightly damaged. In fact, the repair bill for the damages was only $16. The Waycaster automobile, a 1950 Chevrolet, was more extensively damaged. The rear bumper was broken, the left rear of the body was damaged, and the left front part of the top of the automobile was slightly

creased. The estimated cost of repairing the Waycaster automobile was $68, but instead of having it repaired Mr. Waycaster traded for another automobile. The difference in the fair market value of the automobile immediately before and immediately after the accident was $100. (Mr. Waycaster testified that he actually received $200 less for his automobile when he traded than he had been offered before the accident, but that testimony was based on the trade in value of the automobile and not on the fair market value.)

**7.**

When the impact occurred Mrs. Waycaster's head was thrown back sharply, and her son, Jimmy, was thrown to the floor. The boy was uninjured, and Mrs. Waycaster did not think she had received any substantial injury, although she did have a slight pain in her neck as a result of the sudden jerk of her head. Mrs. Waycaster and Sorenson got out of their automobiles and talked for several minutes. They exchanged names and addresses, and Sorenson examined the automobiles to ascertain whether they could be driven. Neither of them walked up to the defendant Colley's truck, although Mrs. Waycaster did make some remark about the truck being improperly parked.

The collision occurred at 10:00 a. m. approximately 75 to 100 feet south of the parked truck. The driver of the truck, Sheppard, was asleep in the truck at the time, and the collision did not awaken him. Mrs. Waycaster and Sorenson did not know anyone was in the truck, and as above stated, neither of them went up to the truck.

After their conversation, Sorenson returned to Harrison and Mrs. Waycaster continued on to Huntsville to meet her husband. As she drove by the parked truck she discovered that she could pass it without crossing over the yellow center line.

By the time Mrs. Waycaster arrived in Huntsville, the pain in her neck was more severe, and she had developed a

headache. Mr. Waycaster decided not to trade automobiles that day, and they returned to Yellville. On the way back they reached the scene of the accident about 4:00 p. m., and Mr. Waycaster stopped to investigate the area. The truck was still at the scene and the driver was in the cab asleep. Mr. Waycaster awakened the driver, Sheppard, and asked him if he had moved the truck or if he knew anything about the accident. Sheppard replied that he had not moved the truck and that he knew nothing of any accident.

Mr. Waycaster completed his investigation of the scene and then continued on his trip home. Later that afternoon he contacted Sorenson in Harrison, and they discussed the accident. Mr. Waycaster gave Sorenson a copy of the repair estimate for his (Waycaster's) automobile, but did not ask Sorenson to pay any damages.

### 8.

In July, 1952, about two months subsequent to the date of the collision, Mr. Waycaster returned to the scene of the accident and made a number of measurements. He is a civil engineer and he prepared a sketch of the scene. However, the sketch was not accurate, except with respect to the measurements of the width of the highway, and the Court limited the introduction in evidence and consideration of the sketch to its depiction of the width of the highway and the position of the yellow lines thereon at the time of the collision.

At the point of the collision the pavement was 19 feet, 10 inches wide. The double yellow line at this point was 17 inches wide. From the east edge of the yellow line to the east edge of the pavement the distance was 7 feet, 10 inches. The distance from the west edge of the yellow line to the west edge of the pavement was 10 feet, 7 inches.

The Waycaster automobile was 6 feet 2 inches wide and was traveling in the east lane, which was 7 feet 10 inches wide. The Colley trailer extended about 5 inches over the east edge of the pavement, and thus there was actually 7 feet and 5 inches of space between the trailer and the east edge of the double yellow line. In other words, the Waycaster automobile had 15 inches clearance between the trailer and the east edge of the double yellow line, or a total of 7½ inches clearance on each side of the Waycaster automobile.

Mrs. Waycaster had only seconds to judge these distances, and as heretofore stated in finding of fact No. 5, in slowing down as she did she was exercising her best judgment under the circumstances and conditions then existing.

As heretofore stated, the paved portion of the highway opposite the parked trailer truck was 19 feet and 10 inches wide but the proof does not show the width of the travelable portion of the highway. The curve was to the right for automobiles traveling north and automobiles traveling in that direction had a lane of only 7 feet and 10 inches wide in the curve while automobiles traveling south had a lane 10 feet and 7 inches wide.

### 9.

By the time Mrs. Waycaster reached home her throat was sore and she still had a headache. She attempted to contact her family physician, Doctor Weist, but was unable to do so. The next day she went to Doctor Weist for an examination. He informed her that she should recover soon, and prescribed some sedatives for her to use.

She continued to suffer from headaches and neck pains, and in July of 1952 she went to Doctor Owens. He examined her, concluded that she might have strained muscles in her neck, and prescribed treatment therefor. Her difficulties continued, however, and later Doctor Owens had X-rays made, which were sent to Doctor Brooksher and Doctor Shuffield for interpretation.

In December of 1952, Mrs. Waycaster consulted Doctor William H. Breit, who examined her and took X-rays. These X-rays were sent to Doctor Kenneth Jones for interpretation.

As is often the case, the medical testimony is not entirely in accord, but from

all the testimony the Court is convinced that Mrs. Waycaster has slight proliferation, or overgrowth of bone, on her cervical vertebrae, and that this condition was caused by the injury she received in the collision herein involved. Prior to the accident she had no difficulty with her neck or head, and the only reasonable inference is that her pains, starting immediately after the accident and continuing thereafter, were caused by the sudden jerk of her head at the time of the impact.

Mrs. Waycaster is still suffering some from her injury, but is greatly improved over her condition shortly after the accident. And, although the proliferation is permanent, the symptoms or pain caused thereby will probably diminish and disappear within a reasonable time. Thus, it is doubtful if Mrs. Waycaster will have any permanent pain or discomfort as a result of the injury she received in the accident.

For some time after the accident she was unable to do all of her housework because of her headaches and neck pains, but at the present time she can do such tasks as long as she does not overwork.

### 10.

The plaintiff, Tom Waycaster, has been required to expend approximately $200 for medical expenses on behalf of his wife as a result of the injury she received in the collision. (He testified that he spent $350, but he was including items that were not actually medical expenses.)

### Discussion

The Court recently reviewed the Arkansas law on the subjects of negligence, burden of proof, proximate cause, effect of the violation of a statute, duty to keep a lookout, duty to keep automobile under reasonable control, emergency rule, contributory negligence, and measure of damages. Kisor v. Tulsa Rendering Co., D.C.Ark., 113 F.Supp. 10. Therefore, the Court feels that it is unnecessary in this discussion to repeat the general rules stated in the Kisor case, and, as to the above named subjects the Court in the instant case adopts the discussion of said subjects in the Kisor case, supra.

The plaintiffs contend that Sheppard, driver of defendant Colley's trailer truck, was guilty of negligence in parking the truck as he did, especially since the truck was allegedly parked in violation of Section 75–647, Ark.Stats. 1947, Annotated, which provides:

"(a) Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 300 feet in each direction upon such highway.

"(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

The Court is of the opinion that Sheppard did not violate the parking statute. The truck was completely disabled and he was forced to leave a part of the truck on the pavement, at least temporarily. He secured the assistance of Shaddox and they attempted to move the truck completely off the highway, but were unable to do so because Shaddox' tractor began slipping in the loose gravel of the side road. Sheppard then made a phone call, apparently for further assistance. Under these circumstances, the parking of the truck came within part (b) of the Statute and rendered part (a) inapplicable.

Moreover, there is some doubt as to whether part (a) of the Statute requires that 20 feet of "pavement" remain clear and unobstructed opposite the standing vehicle, or whether the Statute merely requires 20 feet of travelable highway, including the shoulder. In other words, the Statute requires that "20 feet of such part of the *highway* opposite such standing vehicle shall be left for the free passage of other vehicles", and it is not altogether clear what is meant by "highway." Section 75–412, Ark.Stats., supra, defines street or highway as follows:

"The entire width between property lines of every way or place of whatever nature when any part thereof is open to the use of the public, as a matter of right, for purposes of vehicular traffic."

■ But, even though the meaning of the statute might be somewhat doubtful in this regard, the Court believes that the Statute requires that 20 feet of the "paved or improved or main traveled part of the highway" remain open and unobstructed, and that Colley's truck would have been parked in violation of the statute but for the fact that it was disabled and came within the exclusion provided in part (b) of said statute.

■ As a matter of fact, even if the parking statute were applicable and Sheppard technically violated the same, nevertheless Sheppard would not be guilty of negligence under the circumstances. He took every precaution a reasonably prudent man would take. When the truck was first disabled it was stopped partly on the pavement. Sheppard immediately set out flares, since it was still dark at that time, and then, with Shaddox' help, attempted to move the truck completely off the highway. After moving the truck he reset the flares, even though it was getting daylight by that time. It is difficult to think of anything else he could have done under the circumstances, and the Court is convinced that he exercised ordinary care and was not guilty of negligence.

The plaintiffs further contend that the defendant Sorenson was guilty of negligence in driving his automobile too closely behind plaintiffs' automobile and in driving at an excessive speed in view of the conditions then existing.

Sec. 75–601, Ark.Stats., provides:

"(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing. * * *"

Sec. 75–614, Ark.Stats., provides:

"(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway. * * *"

■ A violation of a traffic statute, while not conclusive, is evidence which may be considered along with all other evidence in determining whether a person is or was guilty of negligence. Kisor v. Tulsa Rendering Co., supra.

■■ It was also the duty of the defendant Sorenson to keep his motor vehicle under such control as to be able to check the speed or stop it, if necessary, to avoid injury to others if and when danger was apparent. And, ordinarily the automobile in front has the superior right to the use of the highway. Jones v. King, 211 Ark. 1084, 204 S.W.2d 548; Acco Transportation Company v. Smith, 207 Ark. 70, 178 S.W.2d 1011.

■ In the instant case the Court is convinced that the defendant Sorenson was guilty of negligence in the operation of his automobile. After driving up behind plaintiffs' automobile, he ascertained that he could not pass because of oncoming traffic. Nevertheless, he drove so closely behind the Waycaster automobile that when Mrs. Waycaster decreased her speed he was unable to decrease his speed or stop before strik-

ing her automobile. The proximate cause of the accident was his action in driving too closely behind the Waycaster automobile and, as above stated, the Court is convinced that he was guilty of negligence.

■ The defendant Sorenson contends that he was confronted with an emergency and acted reasonably under the circumstances. However, the emergency, if any, was created by his own negligence and the emergency rule does not operate in his favor. Kisor v. Tulsa Rendering Co., supra.

The defendants contend that Mrs. Waycaster was guilty of contributory negligence in that she failed to keep a proper lookout and stopped or decreased the speed of her automobile without giving a proper signal.

Sec. 75–618, Ark.Stats., provides:

" * * * (c) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."

Sec. 75–620, Ark.Stats., provides:

"All signals herein required given by hand and arm shall be given from the left side of the vehicle in the following manner and such signals shall indicate as follows: * * * 3. Stop or decrease of speed—Hand and arm extended downward."

■ The rule is stated in Missouri Pacific Transportation Co. v. Sacker, 200 Ark. 92, at page 100, 138 S.W.2d 371, at page 374, as follows:

" 'It is the duty of a motorist if he knows or by the exercise of ordinary care can know, that another car is close behind him to warn the approaching car by some appropriate signal or gesture of his intention to stop his car, and the sudden stopping of a car without any notice to the driver of the car im-mediately behind, if unexplained, is negligence.' "

■ It is also the duty of a person operating a motor vehicle upon the highway to keep a lookout for persons or vehicles rightfully upon the highway.

■ But, "When a person is suddenly confronted with an emergency, not created by his [or her] own negligence, he is not held to the same accuracy of judgment as would be required of him under ordinary circumstances, and if he acts as a person of ordinary prudence would act under the circumstances then existing, he is not guilty of negligence, even though it might subsequently appear that it would have been wiser to have chosen some other course of action." Kisor v. Tulsa Rendering Co., supra, at page 17 of 113 F.Supp.

■ In the instant case Mrs. Waycaster did not give a hand or arm signal of her intention to decrease her speed, nor did she look in her rear vision mirror to ascertain whether a vehicle was behind her. Obviously, the reason for her failure in this regard was that she had no time to give a signal or look in the rear vision mirror. As soon as she saw the truck parked adjacent to the payment, and saw the oncoming traffic, she began reducing the speed of her automobile, and before she had time to take any other action Sorenson's automobile struck her automobile from behind. Under the circumstances, the Court feels that Mrs. Waycaster exercised ordinary care under the conditions then existing and was not guilty of contributory negligence.

In passing it might be noted that Mrs. Waycaster's failure to give an arm signal was not, in any event, a proximate cause of the accident since Sorenson admittedly saw the brake lights on her automobile and was thus advised of her intention to decrease the speed or stop her automobile.

The remaining question is the amount of damages that should be awarded plaintiffs.

Of course, the plaintiff, Tom Waycaster, is entitled to recover for the damage to his automobile ($100) and the medical expenses he has incurred on behalf of his wife ($200), or a total of $300.

Mrs. Waycaster's damages, however, are not so easily ascertained. There is no question but that she has suffered a substantial amount of pain and suffering as a result of her injury, and she is clearly entitled to recover damages therefor. But the future effect of her injury is at least doubtful. It is true that the proliferation on her cervical vertebrae is permanent, but it is doubtful whether the symptoms or pain resulting therefrom will continue indefinitely.

 As defendants contend, before Mrs. Waycaster can recover for future pain and suffering it must appear from the evidence with reasonable certainty that such future pain and suffering are inevitable. Missouri Pacific Transportation Company v. Kinney, 199 Ark. 512, 135 S.W.2d 56.

Therefore, in view of the doubtful duration of Mrs. Waycaster's pain and suffering in the future, the Court feels that the sum of $2,500 will reasonably compensate her for the injuries she received as a proximate result of the negligence of the defendant, S. P. Sorenson.

## Conclusions of Law

**1.**

 The Court has jurisdiction of the parties to and the subject matter of this cause of action.

**2.**

The defendant, T. T. Colley, acting through his employee, James Sheppard, was not guilty of negligence in the driving or parking of his truck, and the complaint, as to said defendant Colley, should be dismissed.

**3.**

The defendant, S. P. Sorenson, was guilty of negligence in the operation of his automobile, and his negligence was the proximate cause of the collision and the damages sustained by plaintiffs.

**4.**

The plaintiff, Mrs. Augusta Waycaster, was not guilty of contributory negligence in the operation of her husband's automobile.

**5.**

The plaintiff, Mrs. Augusta Waycaster, is entitled to recover of and from the defendant, S. P. Sorenson, the sum of $2,500.

The plaintiff, Tom Waycaster, is entitled to recover of and from the defendant, S. P. Sorenson, the sum of $300.

A judgment in accordance with the above should be entered.