ARKANSAS DRILLING COMPANY *v.* GROSS.

Opinion delivered May 27, 1929.

632

*Buzbee, Pugh & Harrison* and *John M. Shackleford,* for appellant.

*McRae & Tompkins,* for appellee.

MEHAFFY, J. This suit was commenced in the Ouachita Circuit Court by the appellee, who alleged that, while in the employ of the appellant, he was injured by reason of appellant's negligence. There was a verdict and judgment in favor of the appellee for $5,000, from which an appeal has been duly prosecuted. The injury was alleged to have occurred on the 15th day of July, 1928, and the case was tried on December 7, 1928.

The appellant was engaged in drilling an oil well in Ouachita County, and had a crew of men working under the direction of one Louis St. Vine, as driller or foreman. The appellee was a member of this crew. The floor of the derrick is about 24 feet square. The hole which the drillers are drilling is about the center of the derrick floor. A steel pipe, called drill-stem, is used in drilling a well, and the drill-stem consists of pipes about twenty feet long, which can be joined together. When two lengths of pipe are joined together, it is called a double. When four lengths are connected, it is referred to as a fourble. Sometimes a four-inch pipe is used, and sometimes a two and one-half. The pipe being used at the time of the injury to appellee was a two and one-half inch pipe. This pipe is much more limber and sways much more than a four-inch pipe.

The only question with reference to negligence or liability of the appellant is whether the driller, in order-

ing the derrickmen to push the drill-stem forward before it was picked up by the line, and the action of the derrickman in complying with this order was negligent. This is the only question of negligence submitted to the jury by the court, and is therefore the only question to be considered here.

If pushing the drill-stem forward before it was picked up by the line was negligence, the appellant is liable; if this is not negligence, the appellant is not liable. There is no question of contributory negligence or assumption of risk, and there is no dispute about the fact that appellee was injured.

Appellant contends that there is no evidence of negligence, and that the court should have directed a verdict for the defendant. It is contended that other drillers adopted the same method used by appellant, and that it was simply a question of judgment, and it is argued that no one is liable for an error in judgment. It contends that, if there were two methods by which the work could have been done, and the appellant, in consequence of a mere error in judgment, adopted a method which resulted in the injury, it is not liable. And it is also contended that the proof shows that the method of performing the work at the time of the injury was the method used by other drillers, and that this was all that could be required of the appellant.

On the question of the manner in which the work was done at the time, the derrickman, Paul Martin, testified that he had been working in the oil fields since 1922; that the derrick was 112 feet high; that there is a double board in the derrick where the man stands to latch the elevators and unlatch them in taking two joints of pipe out or in the hole. The derrickman sometimes has to stand on the double board. He also testified that, when you use two and a-half inch pipe, the double board has a finger-board on it. Where you use a four-inch pipe, it doesn't, but is on the fourble board. It is necessary to use finger-board when you use two and one-half

inch pipe, because it is limber, and the handling of it would be impracticable if you did not use the finger-board. They were using two and one-half inch pipe at the time.

When witness came on duty the day of the injury, the double-board had been knocked out of its place and pushed back about a foot and one-half. Instead of putting it back in place, they nailed it down where it was—about a foot and a-half further back than it was when first put there. This made the finger-board too short, and it became necessary to splice it. This witness, in obedience to the direction of the foreman, spliced the finger-board.

When asked whether it was customary in drilling operations to throw the drill-stem over from behind the finger-board before the line takes up, this witness said: "They hadn't done it on that job; that was the first time we tried it on that job. The drill-stem was racked mighty close, and in lifting it they come near picking up some of the other joints with it." When asked, if the drill-stem is left behind the finger-board until the line picks up, is it easier or harder for the men on the floor to handle it, he answered that he imagined it would be easier, but, if straightened out by its own weight, it would have a tendency to swing out or kick when you first pick it up. That he threw the drill-stem out in obedience to the order of the foreman, and, when he did this, it broke the finger off on the double-board. When he threw the drill-stem out from behind the finger-board it jerked in the middle where the sag was and kicked back and broke the finger-board off. The piece that was broken off fell about 40 feet, and hit appellee on the head. It staggered him when it hit him, and he grabbed a pair of tongs. This was the first time he ever threw a drill-stem before the line picked it up. This is the first job witness ever worked on that had two and one-half inch pipes.

When the pipe was pushed out, it broke the finger-board in two. Witness had seen finger-boards broken by pipes, but had never seen them broken by two and one-half inch pipes. The finger-board on the fourble is subjected to a strain. The double-board had been knocked out of place, and that caused the finger-board not to stick out as far as it had, and witness spliced it so the finger-board was sticking out as far as it originally did.

Two-inch drill-stem is limber and will go all over the derrick, and you could not operate it if you did not have a finger-board on the double-board. The way they had been operating was to latch on the pipe before pushing it. The pipe swiped the finger-board and broke it off. Witness does not know whether it was a backward or forward swipe. The limberer the drill-stem is, the more substantial the finger-board should be.

With the drill-stem standing in the double-board there a foot and a-half back, that would make the pipe bend back in the middle towards the board. When the double-board is pretty far out, there is considerable sag in the two-inch drill-stem. There is always some sag.

Witness has been in the oil fields since 1922, and worked for various companies, and held all positions in drilling crews except running a rig. It is an unusual thing for drill-stem, where two and a-half inch drill-stem is being used, to be thrown out from behind the finger-board on the double-board before the line picks up where there is a bend in the pipe. Where the finger-board is in line, you don't have to do that. You have to push it a little, and then it goes up.

When asked if what he did was out of the ordinary or was the customary practice, he answered that that was the first time on that job. It was out of the ordinary there.

Bill Evans testified that he had been engaged in the oil fields about 10 years, and has done drilling, and had drilling crews under him. That he never worked on

a rig where they made a practice, with two and a-half drill-stem, of throwing it out from behind the finger-board before the line picked up, and that he did not think he would like to because it causes it to give a kick back at the bottom, and it will sway when it is thrown out from behind the finger-board. When they throw it out from behind the finger-board, it swings it so much that when it comes back it swings back with lots of force. Two and a-half inch pipe is harder to handle than four-inch. It is limberer, and sways more.

The first witness knew about the injury was when he heard the block hit Gross' head. Then he saw him stagger. It cut him on the head. He had on a heavy felt hat, and it knocked this off. Witness took hold of him and supported him. The piece that hit Gross' head was from a foot to eighteen inches long, a piece of fence rail, three-cornered shape, and had some nails driven in it. Would weigh from four to six pounds. It fell from 40 to 45 feet.

Witness said it was unusual, as far as he knew, to throw the two and a-half inch drill stem out from behind the finger-board on the fourble board before the line picks up. There is a good deal of sway, and when the elevator picks the pipe up it straightens out, and the pipe is standing on the derrick, and if it is thrown out, the jerk is more than if it is left behind the finger-board when the elevators pick it up. If it is picked up by the elevators, it does not whip the man around if it is behind the finger-board. It steadies it when it comes past. It is out of the way to push it forward before lifting up on it. Out of the way to pick it up behind the finger-board. The normal thing to do is to pick it up with the elevators before they push it out. All the drillers he ever worked for would object to it being thrown out on account of it being liable to hurt the pipe racker in the swing and kick it gets. The names of the drillers witness worked under were John Chew for the Slaughter Drilling Company, D. McWhirter for Dr.

Bussey, in Drew County. These men objected to the derrickmen throwing out the drill-stem before the line picked up. He worked with two and one-half inch pipes on the Bussey job and four-inch pipe on the Slaughter job. With a limber two and a-half inch stem the danger would be increased, and has a greater bow in it. If the double-board was a foot and a-half out of line, the drill stem would come up against it on account of its limberness.

The appellee himself testified that he was 28 years of age; was working at the time of the accident under St. Vine, and using two and one-half inch drill-stem; that he had worked around two and a-half inch drill-stem before. They were harder to handle than a drill-stem of larger size. It will not stand up like a stiffer stem. It will sag out over the rotary, and the block won't clear unless you use two finger-boards, and so you use one on the double-boards to hold the slack. Finger-boards on the double-board would be about the middle of the stem. St. Vine gave the orders when witness was hit, but he did not hear St. Vine tell Martin to throw the drill-stem out from behind the finger-board. First he knew, something hit him. He had never worked before where they made a practice of throwing the two and a half inch drill-stem out from behind the finger-board before the elevators picked up, and would not work in a crew where it was done. He was working on the floor, and did not expect to be injured while working there. The piece that hit appellee weighed something like five or six pounds. There were some nails sticking out, about forty-penny spikes. Two and a half inch drill-stem is bad about swaying from one side to the other. He should not have pushed it out until the elevator picks up. Witness had worked as a derrickman himself, and always pushed the pipe out after the pipe is taken off the floor.

W. M. Coates, a witness for the defendant, testified that he had seen the work performed that way by

drillers a number of times. That, when pushed out, that throws the bend out, tending to straighten the pipe, as the elevator picks up; that keeps the bottom from switching and whipping around. If you pick it up without throwing it out from behind the finger-board, the bow in the pipe swings around. That is likely to hurt the men on the floor. When the elevator jerks the pipe up, that slack comes out with such force that it causes the bottom to swing around. It becomes a matter of judgment, under the circumstances under which they are working, whether to push it out first or elevate it without pushing it. The safest way is to throw it out. There is nothing unusual for a drill-stem like this to be pushed out before it is picked up. Nothing unusual about the finger-board being broken. That is one of the things they have to look out for. It is safer for the man on the floor to push it out first. It depends on the pipe. When you are using heavy pipe, it is stiff as a board. There might be more danger of knocking off the finger-board the more limber the pipe is.

Witness never inquired about any of the big companies, as to whether they used this method or not, but said they all do it. Witness and Dr. Falvey and Mr. Johnson owned the lease, and have a contract with the Arkansas Drilling Company to drill a well. He was not interested in the drilling of the well.

Louis St. Vine, a witness for the defendant, testified that he was the driller on the job, and that the end of the finger-board on the double-board was broken off, and hit Gross on the head. That he was handling the operation in the usual and customary way. Been working in oil fields on drilling rigs since he was 17. He told the derrickman to push the fourble away from the finger-board before he picked up on it. Has worked derricks and done it, and has done it for other fellows. Figured it would be easier all the way round to handle the stem that way. There is considerable bow in two and a-half inch pipe. You don't take the strain off

with a double-board finger-board, it is to catch the sag. Doesn't know what knocked the finger-board off. The pipe was the only thing that would kick it off. If there is no bow in the drill-stem, it will pick up straight. There is not any set rule or instruction to the fellow that is handling the pipe. Some throw it out before and some don't. It is left to the opinion of the man handling the pipe. He would not say that his opinion in this case was wrong and resulted in the boy getting hurt. Doesn't know exactly whether or not the board would not have been broken if it had not been thrown out, probably would, or would not have. As to which method they use, it depends upon the opinion of the crew. Witness' opinion was that it would make it easier to the pipe racker. The first one they threw out this way hit the boy. Where the bow is, is at the double-board. If he pushes the top out, this finger-board holds the bow and makes it pick up straight.

Joe Modisette testified that he had seen a great many drill-stems pushed out before lifted. When asked if the big companies made a practice of throwing out limber drill-stems before the line picks up, he answered that they used to throw it out. That some men do now; the companies don't have anything to do with it. He doesn't think it is any more dangerous than to take it up behind the finger-board.

H. M. Neal, a witness for defendant, testified that he was a driller; worked for practically all the major companies as a driller. Has heard the method described by the witnesses used by the Arkansas Drilling Company when plaintiff was hurt, and there was nothing in the method used that was out of the ordinary. He did not see the rig, and does not know how much bend there was in the drill-stem, nor the exact position of the finger-board on the double-board where it was knocked back, nor how quick the line picked up after the thing was thrown out. That would depend on the length of the fourble. It all depends on the shape of the drill-stem.

If the stem is crooked, the collars are liable to hang on other fourbles standing in the derrick. Has used two and a-half inch lots of times. It is customary to throw it out from behind the finger-board to keep it from hanging under the other collars. One is not necessarily taking chances of injuring men when he orders the derrickman to throw out the drill-stem from behind the finger-board before the line picks up. It is owing to the condition of the drill-stem. Witness does not know whether this drill-stem was crooked or straight. If it was straight it would be easier to elevate it behind the finger. Not knowing the condition, he could not say if it was right or wrong.

Johnson, vice president of the Arkansas Drilling Company, saw the accident just as Gross was hit on the head. The way the drill-stem was handled was not an unusual or out of the ordinary method of handling it. If the double-board had been put back in its original position, it would have been liable to be hit again or broken off, and it would have fallen down on some one, and been a serious accident. It would not be clear of the block. As to whether they would order the derrickman to throw out the drill-stem, they could agree among themselves, the derrickman, the driller and the crew. If they wanted to throw it out to make it easier for the pipe rackers in the handling of the pipe, it is the custom to do so.

The above is, in substance, the testimony on the question of the method of doing the work at the time, and also on the method used by other companies.

As stated by the appellant: "The only issue of liability submitted to the jury in this case was the alleged negligence of the defendant's driller in directing the derrickman to push the drill-stem from behind the finger-board before the elevator line picked it up, instead of waiting for the line to pick it up from its place in the stack and then pushing it out beyond the finger-board."

And appellant asks: "Should a jury of laymen, uninformed in the technique of the business, be permitted

to consider alternative methods, having the sanction and judgment of experienced operators, and arbitrarily substitute their judgment for that of the experienced operator and convict him of negligence solely on the ground that the method did not meet their own conception of what was reasonably safe in the circumstances?''

A jury of laymen, uninformed in the technique of the business, certainly would be permitted to determine whether the act was negligent when there was a conflict in the evidence. And, while there is some testimony that other drillers have used the same method that was used by the appellant at the time Gross was injured, there is no testimony that careful, prudent men adopted the method used by appellant, and the first case to which attention is called by the appellant states:

''The rule of law is that the employer must exercise such care and skill as, under the circumstances, reasonable and ordinary prudence requires to be used, * * * but it may be said generally that a man cannot be held responsible in damages for the consequence of an error in judgment carefully formed, after an intelligent survey of all the elements in the problem which he is called upon to solve'' *O'Neal* v. *Chicago, R. I. & P. Ry. Co.*, 66 Neb. 638, 92 N. W. 731, 60 L. R. A. 443, 1 Ann. Cas. 337.

The undisputed proof in this case shows that this is the first time that the drill-stem had ever been pushed out from behind the finger-board before picking it up. The abstract of the testimony does not show how long they had been at work at this job, but it does show that the well was down 3,245 feet at the time of the injury. We agree with counsel for appellant that it is negligence which makes the master liable, and not a mere error of judgment. But in this particular case there was a conflict in the testimony as to whether this method was more dangerous and whether the adoption of this method, that is, the pushing out of the drill-stem from behind the finger-board before taking it up, was negligence, and this question was properly submitted to the jury.

Appellant calls attention to a number of other cases which announce the correct rule of law, but we do not think that the facts in this case bring it within the rule announced. It is true that, if one adopts the method used by careful and prudent men, he is not guilty of negligence, because negligence means the doing of something that a person of ordinary prudence would not do under similar circumstances, or the failure to do something that a person of ordinary prudence would do. And the test of the master's liability, in suits for injury to the servant, is the exercise of reasonable and ordinary care, and not whether he has employed customary methods. If the method employed is not the exercise of ordinary care, then the master is liable. He might refuse to adopt the customary and ordinary method and still not be liable, if he exercised reasonable and ordinary care.

"While the test of a master's liability is the exercise of reasonable and ordinary care for the safety of the servant, and not whether he has employed customary methods, yet, as a general rule, a master will not be held responsible for injuries to a servant in the course of his employment where the usual and customary methods of work are employed, provided such methods are generally employed by prudent and careful men engaged in similar business, and provided they did not disregard the safety of the servant." 39 C. J. 467.

"Testimony as to the common experience of custom or usages of railroads, without reference to whether they are wisely or badly managed, or to their particular location or surroundings, or to peculiar circumstances which, in any given instance, would tend to illustrate the diligence or negligence of a company in recovering or failing to recover its switch keys, or in guarding or failing to guard its switch, would be too vague, uncertain and indefinite to aid a jury in determining a case on trial, whether or not the railroad company was diligent or negligent in these respects. *East Tenn., Va. & Ga. Ry. Co.* v. *Kane,* 92 Va. 187, 83 S. E. 18, 22 L. R. A. 315.

Testimony as to custom of other drillers is a circumstance which the jury may consider in determining whether due case has been exercised.'' *Donelly* v. *Ft. Dodge Portland Cement Corp.*, 168 Ia. 393, 148 N. W. 982.

"Defendants insist that, if the master conducts his business in the manner customarily followed by experienced men in the same line of business, it is conclusive against negligence. * * * The rule, to be correctly stated, should include the qualification that the other similar business conducted in the same way should be conducted by prudent and ordinarily careful men. Thus, if the triers of fact believe that the other similar business was conducted by such prudent and careful men in a certain way, they would not be permitted to say such mode, followed in the given case, was negligence. For a mode of business which is adopted and followed by men of ordinary prudence and care is the standard not only in this State, but in others to which we will refer. It is for the jury to find the preliminary fact whether the men shown to have so conducted their business were, in fact, prudent and careful men.'' *Fairfield* v. *Bichler*, 155 Mo. App. 45, 190 S. W. 32; see also *Hamann* v. *Milwaukee Bridge Co.*, 136 W. 39, 116 N. W. 854; *Jackson* v. *St. L. & S. F. Ry. Co.*, 81 So. 797; *Cramer* v. *Aluminum Co. of America*, 239 Pa. 120, 86 Atl. 654; *Rupp* v. *Chicago B. & L. Ry. Co.*, Mo. Ap., 234 S .W. 1050; *Johnson* v. *Waverly B. & C. Co.*, 276 Mo. 42, 205 S. W. 615; *Boos* v. *M. St. P. & S. S. M. Ry. Co.*, 127 Minn. 381, 149 N. W. 660.

The evidence in this case being in conflict as to whether the method adopted was negligent or not, it was properly submitted to the jury, and if there is any substantial evidence to support a verdict of a jury, their finding will not be disturbed.

"In testing the question of the legal sufficiency of the evidence we must, under rules well settled by the decisions of this court, view the testimony in the light most favorable to appellee, and give it such force as the jury might have given it.'' *St. Louis-San Francisco Ry. Co.* v. *Whitfield*, 155 Ark. 560, 245 S. W. 323.

644

Appellant next contends that the verdict is excessive. The evidence shows that a block of wood several inches long, and weighing from four to six pounds, fell 42 feet, and struck the appellee on the head. He went to a doctor at El Dorado, who is not interested in the drilling company, but who is interested in the lease, and the owners of the lease had the contract with the drilling company. While he would not be permitted to testify as to anything he learned by reason of treating him, he was permitted to examine the appellee in court in the presence of the jury. And while he testified, in substance, that from that examination he did not think the injury was serious, yet it was done in the presence of the jury; they saw and heard the examination, and the appellee testified that he was still suffering from the injury. That he became dizzy; could not work, and could not see to read for any length of time, and the muscles on the inside of his arms and legs twitch and jerk; that he has headaches which prevent him from sleeping well at night, and he often wakes up with a jump at night. That his neck was stiff and sore; that he has always done hard manual labor, but was unable to perform such labor after the injury. He must also have suffered mental pain and anguish as well as physical pain. The amount of damages awarded by the jury has given us more concern than any other question in the case, but we have reached the conclusion that there is some substantial evidence to support the verdict.

It is next contended by appellant that the court erred in giving to the jury plaintiff's instruction No. 2. That instruction tells the jury that it is proper to take into consideration the bodily injury received by the plaintiff, if any, the physical pain and mental anguish suffered or endured by him in the past, if any, as well as such physical pain and mental anguish as he is reasonably certain to endure in the future, if any, his loss of time, if any, together with his decreased capacity for earning money, if any is shown, and from these, as shown by the evidence, assess his damages at such a sum as

they may find from the evidence will reasonably and fairly compensate him for the injury received.

Appellant argues that this instruction submits to the jury the issue of future pain and decreased capacity for earning money, and contends that there is no testimony sufficient to show, with reasonable certainty, that the plaintiff would suffer pain or that his earning capacity had been decreased.

We cannot agree with appellant in this. Appellee's testimony shows that he still suffers with headache, and suffered pain up to the time of the trial. It also shows that his weight is 125 pounds, whereas it was 145 pounds before the injury, and certainly, if he was telling the truth about suffering at the time of the trial, it is reasonably certain that he would continue for some time, at least, to suffer pain. He testified also that he could not labor as he had before; could not earn the money, and therefore there is testimony showing that his earning capacity had been diminished, and we therefore think there was testimony justifying the court in giving this instruction.

In addition to this, the appellant asked the following instruction, which the court gave: "The jury are instructed that, if you find from a preponderance of the evidence in this case that the plaintiff is entitled to recover damages from the defendant, you would not be justified in awarding him damages on the theory of permanent injuries, unless the evidence shows with reasonable certainty that he has suffered permanent injury."

This instruction, requested by the appellant and given by the court, submitted to the jury the question of permanent injury. Appellee's instruction did not submit the question of permanent injury. It did submit the question of future pain and suffering and loss of earning capacity, but there might be future pain and suffering and loss of earning capacity without the injury being permanent. That is, it might continue for

a time only. But the appellant says that, under the ruling of this court in the case of *St. L. I. M. & S. R. Co.* v. *Bird,* 106 Ark. 177, 153 S. W. 104, it was error to give this instruction. The court said in the Bird case:

"The court erred in not granting appellant's prayer for instruction No. 2. The testimony, viewed in the strongest light in favor of appellee, does not make it reasonably certain that Wharton Bird was permanently injured. Unless there is testimony tending to show with reasonable certainty that the injury is permanent, the court should not permit the jury to assess any damages for permanent injury. * * * Mr. Hutchinson says: 'The jury may take into consideration future as well as past physical pain and suffering, but, to justify them in doing so, it must be made reasonably certain that such future pain and suffering are inevitable, and if they be only probable or uncertain, they cannot be taken into the estimate.' "

The court in this case told them, at the request of the appellant, that they would not be justified in awarding damages on the theory of permanent injury unless the evidence was with reasonable certainty that he has suffered permanent injury.

We think the instructions given by the court fully and fairly state the law by which the jury was to be governed, and that there was no error in giving instruction No. 2 requested by the appellee.

As we have said, the testimony was conflicting on the question of negligence and the extent of the injury, and this court does not pass on the credibility of witnesses nor the weight to be given to their testimony. This is the province of the jury, and, if there is any substantial testimony to support the verdict of a jury, the verdict will not be disturbed by this court on the question of the insufficiency of the evidence.

We find no error, and the judgment is affirmed.