Rosie K. WELTER *v.* James CURRY et al

75-371                                    539 S.W. 2d 264

Opinion delivered July 19, 1976

*Wright, Lindsey & Jennings,* for appellant.

*Gordon & Gordon, P.A.,* for appellees.

JOHN A. FOGLEMAN, Justice. Appellees brought this action to recover damages arising from a collision between an automobile driven by appellant Rosie K. Welter and a Honda minibike operated by James Curry, Jr., son of James Curry and Sharon Kay Curry. The incident occurred around

5:00 p.m. on October 6, 1973 on the paved portion of Highway 95 near Ramsey's Grocery, about four miles north of Morrilton. James Jr. was 10 years of age at the time and his five-year-old sister was riding on a seat behind him. Both children suffered injuries and the bike was virtually destroyed. The evidence as to exactly how the collision occurred is in hopeless conflict. The two children had come from the Curry dwelling about one-half mile west of Highway 95, on a dirt road for the purpose of putting air in the tires of the minibike at Ramsey's Grocery. The collision occurred as they started to cross the highway on their return journey. Most of the conflict in the testimony is in the different versions as to the point of approach to the highway by young Curry and the distance he had travelled toward the west from the grocery when he was sighted by the appellant and when the children and minibike were struck by her automobile.

Appellant raises five points for reversal. We find that the judgment must be reversed as to James Curry, Jr. on two of these points.

We find error in instructions given the jury. First there was error in including among the elements of damages the third alternate form of AMI, Civil, 2213 (a). This form is to be used only when there is evidence that there is permanency of injuries. See Note on Use, AMI, Civil, 2202. That evidence must tend to establish permanency with reasonable certainty. It must not leave the jury to speculation or conjecture. *St. Louis, I.M. & S. Ry. Co.* v. *Bird,* 106 Ark. 177, 153 S.W. 104; *McCord* v. *Bailey,* 195 Ark. 862, 114 S.W. 2d 840; *Missouri Pacific Transp. Co.* v. *Kinney,* 199 Ark. 512, 135 S.W. 2d 56; *Midwest Bus Lines, Inc.* v. *Williams,* 243 Ark. 854, 422 S.W. 2d 869.

There is no doubt that James, Jr. suffered serious injury. He was treated by Dr. Thomas Hickey at Morrilton and Dr. John Lohstoeter, an orthopedic surgeon, in Little Rock. He was put in traction for seven days at St. Vincent Infirmary in Little Rock, where he was a patient for exactly three weeks. Prior to discharge he was placed in a body cast. It was removed March 1, 1974, after which he remained in bed at home for about ten days to two weeks. Thereafter, it was necessary that he use crutches until April 23, 1974. At the time of the

trial, his right leg was smaller and shorter than his left, he walked with a limp, and was wearing a special pair of shoes with a five-eighths inch sole and a one-fourth inch heel for the right foot. Dr. Lohstoeter had prescribed an exercise regimen for him to follow for a period of four to six years. At the time of the trial, his mother testified that he had regained virtually all of the strength of his right leg, but that he complained intermittently of pain and trouble with it. The child said that he had not regained the strength of that leg. He lost a year in school. A tutor was employed for him for a time. He will be checked periodically by Dr. Lohstoeter until the end of his growth period. At the time of the trial, Dr. Lohstoeter had not seen him since April 17, 1975.

Dr. Lohstoeter testified for appellees on direct examination substantially as follows:

James had suffered a transverse split fracture of the right thigh bone at the upper and middle one-third junctions. This involved the bond between the hip and the knee. There was a shortening of the leg because of muscle spasms. Traction was utilized to adjust the bone fragments into an optimum position for healing. In a youth of James' age, bone growth is stimulated by a fracture, so it was necessary to allow some shortening of the leg to compensate for the extra growth. James would have over six years for this growth of one to one and one-fourth inches to take place. The shortness is to be anticipated for one and one-half to two years. On examination on January 28, 1974, James' condition was very stable and very good. X-rays showed good healing and good maintenance of the casted position. When the cast was removed, there was good healing of the fracture elements. Muscle tone was definitely wasted away. On March 15, 1974, James was progressing quite well. He still had some stiffness in the right hip, because of associated scarring and strain elements. On April 23, 1974, when the crutches were discarded, James was put on a full weight bearing program for the next four weeks, to be fully realized during the last week of May or the first week of June. He still had a great deal of wasting away of muscles and had not learned to protect the ligaments at his knee, ankle and hips. The shortness

of the leg causes a pelvic tilt. To correct this, the placement of a heel lift was recommended on June 7, 1974. X-rays of the right foot revealed no damage, but there was a softening of the bones which accompanies immobilization and disuse. On August 12, 1974, the boy was complaining of pain in the right leg when he walked on it a great deal and occasionally when he did not walk. There was laxity in the ligaments. The doctor stressed the necessity for diligent application to the exercise routine. This admonition was repeated on October 24, 1974. On Jaunary 7, 1975, James displayed better walking and stance pattern. While quadriceps atrophy was still present in the right leg, the muscle tone was building and it was evident that the boy was applying himself diligently. His condition was quite good on April 7, 1975, even though he still displayed some front thigh muscle smallness and loss of tone by comparison with the left side, but there had been a fifty per cent correction which was "roughly par for the course." His right knee was quite stable and there was not a great deal of laxity there, even though there were so-called noises when he was bending it back and forth. His gait pattern was good and without stiffness. The bone fracture was totally healed, stable and molded, and there was no rotational deformity to any extent. The shortness was still present, but it will be overcome in five or six years. His right leg had returned to equal, if not dominant position. There is no reason why he should not return to normal activities. His dysfunction now existing will regress and lessen with the passage of time and he will, in the doctor's opinion, return to full function without any disability to the leg. A limited degree of normal activity for his age group was recommended. He should withstand tackling for thighbone and fracture elements, but he is advised not to play football where he may do injury to his knee because he does not have muscle in the front thigh to take the buffing around the knee. He is more restricted in normal restriction, inflection and extention capabilities at the knee than the doctor would anticipate him to be. Improvement over the next two years is expected and when he reaches full growth pattern, there will be no relative shortening so far as the right leg, of which he now has good use, is concerned.

This can only be determined over a three to six year span. The doctor was hopeful that in five to six years, James will have absolutely normal use of his leg. The rigid exercise program to achieve this is an abnormal load for the youngster to bear. It requires him to exercise ten to fifteen minutes three or four times a day to maintain his continuity to normalcy. The doctor anticipated a very good result.

James is to return to the doctor within one year from the last examination and when he is fourteen years of age, a scanogram will be performed to measure the thighbone and tibia. This will probably be needed again when he is sixteen years of age and also when he is seventeen or eighteen. There was no significant cross-examination of the doctor.

Clearly, there is no substantial evidence of permanent injury. The jury could have considered the nature, extent and duration of the injury under the first alternative of AMI, Civil, 2213 (a).

The evidence in this case is readily distinguishable from that in *Bailey* v. *Bradford*, 244 Ark. 8, 423 S.W. 2d 565; *Belford* v. *Humphrey*, 244 Ark. 211, 424 S.W. 2d 526; *Arkansas Drilling Co.* v. *Gross*, 179 Ark. 631, 17 S.W. 2d 889 and *Missouri Pacific Transportation Co.* v. *Mitchell*, 199 Ark. 1045, 137 S.W. 242, relied upon by appellees. In *Bailey*, there was a brain injury to the child there involved, and, at the time of the trial, she had a fear of riding in an automobile, had trouble with her speech, and still suffered headaches. She could not carry on a conversation without getting tangled up with her words and having to stop.

In *Belford* the injured party had suffered a personality change, was unable to perform certain movements without pain, was, after twenty months, still taking eight muscle relaxant pills per day, and would have difficulty obtaining employment where a physical examination was required. In *Gross*, the defendant rather than the plaintiff requested an instruction making the permanency of the injury a jury question. In *Mitchell*, there was evidence of permanency of injuries and the question there was excessiveness of the verdict rather than sufficiency of the evidence to make a jury question on

permanency of the issues.

In still another case, *Duckworth* v. *Stephens,* 182 Ark. 161, 30 S.W. 2d 840, the nature of the injury, a fracture of the skull at the base, was held to be sufficient evidence of permanency to make a jury question. The testimony of the treating physician was that this injury, with the accompanying long period of unconsciousness of the patient and his bleeding from the ears, was necessarily a serious condition. The testimony of the injured party was that, at the time of the trial, several months later, he still had a discharge of pus from his ear and was still suffering great pain.

It would be a work of supererogation to compare the evidence in this case with that in others of the many cases wherein we held the evidence to be either sufficient or insufficient to pose a jury question on permanency. It is sufficient to say that the evidence in this case neatly fits into the pattern of those cases holding the evidence insufficient to produce a jury question, exemplified by *St. Louis, I.M. & S. Ry. Co.* v. *Bird,* 106 Ark. 177, 153 S.W. 104. There a seven year old boy, after being struck by a train at a railroad crossing, had suffered spasms over a period of eleven months between the injury and the trial, had become very nervous and irritable in contrast to his previous quiet nature, and had lost weight and appetite. His physician testified that the duration of the youth's condition was hard to foretell; that, although he might get well and might not, it was questionable that he ever would; and that the question depended upon the amount of involvement of the child's nervous system and nerve centers of the brain, but that it was possible he might get well under the proper surroundings; that his condition might develop into a paralytic one or a temporary loss of vitality to the extent that he would never get well; that he would have to get well in the next few years or he would never get well; that recovery from neurasthenia from a shock after a period of eleven months, was possible; that he could not say that the probabilities of recovery were greater than of his not recovering in a reasonable time; and that, the case being a doubtful one, the doctor could not be sure whether the injury was permanent or not. This evidence was at least as favorable to the plaintiff as the evidence here. The defendant asked the court to instruct the jury that the evidence did not warrant a verdict for

the child, Wharton Bird, for permanent injury. We held that the court erred in not granting the request. We said:

> *** The testimony, viewed in the strongest light in favor of appellee, does not make it reasonably certain that Wharton Bird was permanently injured. Unless there is testimony tending to show with reasonable certainty that the injury is permanent, the court should not permit the jury to assess any damages for permanent injury. [Citations omitted.]

> *****

The experts on behalf of appellee did not testify that, in their opinion, the injury to Wharton Bird was permanent. It was a matter of speculation with them as to whether it was permanent or not. This being true, it must also have been only a matter of conjecture with the jury. But to fulfill the requirements of the law there must be affirmative testimony to the effect that the injury was permanent, before the jury would be authorized to find that such was the fact; and the court should not allow the permanency of the injury to be considered as an element of damage, where the witnesses themselves are uncertain as to whether there would be any permanent injury, and where the nature of the injury, per se, does not show that the injury was permanent.

As we have heretofore pointed out, the injuries in this case make it unlike those upon which appellees rely, in which the nature of the injury is itself sufficient evidence of permanency.

Another error was the inclusion of AMI, Civil, 2213 (g) in the instruction regarding the measure of damages to James Curry, Jr. The specific objection made went to the inclusion of the word "scar." It does not seem that a non-disfiguring scar, which is ordinarily not visible and which does not in any way diminish the future earning power of a minor boy, is a compensable damage, even though it is permanent. See *Arkansas & Louisiana Ry. Co. v. Sain*, 90 Ark. 278, 119 S.W. 659, 22 LRA (ns) 910; *Pine Bluff S & S R. Co. v. Leatherwood*, 117 Ark. 524, 175 S.W. 1184. See also, *Missouri Pacific R. Co.*

v. *Riley*, 198 Ark. 372, 128 S.W. 2d 1005. Appellees were well aware of this limitation when they alleged in their complaint that young Curry had suffered disfiguring scars that would cause him humiliation and embarrassment.

The evidence in this case fell far short of a showing that the boy had any scar that was compensable. His grandmother testified that, while he was in the hospital, the boy had a raw sore clear around the back of his right leg and another between his knee and his thigh and that it took a long time for these to heal. She testified that at the time of the trial he still had a big scar on the back of his leg and one "on top" between the knee and the thigh. His mother testified that a cast, which had covered James' body from his chest just below his shoulders down to his right foot on one leg and to his left knee on the other, caused scarring on his thigh and on the calf of his right leg. There is no other testimony about the boy's scars.

Assuming that this testimony was sufficient to indicate that the scars were permanent, there is not a word of testimony to indicate that they are disfiguring, discomforting, humiliating, disabling, or that they would normally be visible. Appellant's objection was well taken. If, indeed, the scars were a basis of compensable damage, there should have been evidence available to make a proper showing. Where definite evidence is available, "guess work" evidence would leave a jury to pure speculation. *Thomas* v. *LaCotts*, 222 Ark. 171, 257 S.W. 2d 936. The situation might have been different if the scar had been exhibited to the jury. Appellant's objection was not answered by the trial judge's remark that all appellant's lawyer had to say was, "Show me the scar." The burden of proving entitlement to damages remained upon appellees and no burden ever rested upon appellant in this respect.

We do not find reversible error in the court's refusal to submit to the jury the issue of the negligence of the father, James Curry, by special interrogatory.

Appellant alleged in her answer, counterclaim and third party complaint that the collision and the resulting injuries and damages were proximately caused or contributed to by the negligence of the parents and by the negligence of James

Curry, Jr. which she contended should be imputed to the parents. Appellant specifically alleged that the father was negligent in entrusting a Honda minibike to his young son who was not, and could not be, licensed to operate it on the highways, in permitting the little daughter to ride as a passenger on the vehicle, in failing to properly supervise the children in the use of, and travel on, the bike, in permitting the young boy to ride the bike across the highway with his young sister as a passenger and in failing to instruct the boy in the proper operation of the bike when attempting to cross a paved highway and to apprise him of the dangers of crossing a paved state highway on a minibike with a five-year-old child as a passenger. Appellant sought contribution from the father as a joint tortfeasor. She also alleged that his fault exceeded hers. By an amendment to her pleading, appellant alleged that Curry, Sr., the owner of the minibike, allowed his minor son to operate it at the time and place of the collision, knowing that the child's operation of the vehicle was prohibited by law by virtue of the child's youth, incompetence and inexperience and that he knew that the child would operate it negligently and without having a valid license. For these reasons, she sought full indemnity from the father.

The evidence, viewed in the light most favorable to appellant, certainly raised a question of fact as to the negligence of the parents, who were themselves, seeking recovery from appellant. The case was submitted to the jury for a general verdict. There were verdict forms for the jury to find for or against the parents on their claim against appellant, and to find for or against them as next friends of each of their minor children. There were also general verdict forms for findings for or against appellant on her counterclaim against James Curry for property damage. Among the instructions given the jury, there was one directing the jury to compare the negligence, if it found appellant negligent and also found a party claiming damages negligent, and if the party claiming damages was less negligent, to reduce his damages accordingly. There was no instruction or interrogatory which called upon the jury to state the percentages of negligence attributable to any party or to state whether it found either of the parents or the Curry boy guilty of any negligence. In the jury verdict in favor of the plaintiffs and fixing their damages, there is no indication whether the

jury found all the plaintiffs to be without negligence or whether the verdict was arrived at by comparing negligence, with the greater negligence being attributed to appellant. We find no verdict or judgment on appellant's counterclaim for damages to her automobile. The general verdict form could not be interpreted as relating to appellant's countersuit for indemnity or contribution.

Appellant had asked the court to submit separate interrogatories asking the jury whether the father was negligent, and, if so, to apportion the negligence between her and the father. The circuit judge refused, saying that his instructions to the jury were sufficient to cover the matter. Appellant's attorney also asked that an additional verdict form be submitted for the jury's use, in case it found against appellant on any of the other forms, in finding for her and against James Curry, the father, and fixing an amount of recovery against him, or, conversely, in finding against her and for him on her third party complaint. This request was also denied. Appellant's attorney also submitted specific forms for special interrogatories by which the jury could answer affirmatively or negatively whether they found the elder Curry guilty of negligence which was a proximate cause of damages sustained by the plaintiffs and if they answered in the affirmative, to apportion the negligence between James Curry, the father, and appellant, by percentages.

This court has been most reluctant to hold a trial judge in abuse of discretion in submitting a case to a jury for a general verdict, rather than on interrogatories, and we cannot do so in this case. Appellant had sought both indemnity and contribution from James Curry, Sr. The only responsive pleadings were general denials of appellant's allegations. It is true that no judgment was entered on these features of the case or on any part of appellant's counterclaim or third party complaint.

. Still, we cannot say that there was an an abuse of discretion. The burden was on appellant to demonstrate error on appeal. *Holt* v. *Holt,* 253 Ark. 456, 486 S.W. 2d 688. Appellant failed to do this. She argued in her original brief that the determination and quantification of the negligence of James Curry, Jr., James Curry and Rosie K. Welter were required,

without saying why. In her reply brief, she said that the court allowed the jury to ignore the negligence of James Curry, Jr. and Sharon Curry in awarding damages against Mrs. Welter. Yet the jury was instructed to compare negligence and we are unable to say that there was any more reason for the court to require that this be done by special interrogatories in this case than in others involving comparative negligence.

We can only assume that appellant's contention is based upon the objections registered in the trial court, even though appellant may have abandoned the contention that she is entitled to either indemnity or contribution from the parents. If she were, the failure to submit the interrogatories requested would have been a clear abuse of discretion. But we have found no basis for either contribution or indemnity in this case. Appellant was not entitled to contribution, because the parents were not joint tortfeasors with appellant under the Uniform Contribution Among Tortfeasors Act. Ark. Stat. Ann. § 34-1001 et seq (Repl. 1962). It seems to be well settled that there is no right to contribution under the act from one who is not liable in tort to the injured person. Ark. Stat. Ann. § 34-1001, 1002; Annot. 34 ALR 2d 1107 (1954). Before the statute comes into play, there must be a common liability to an injured party, and the injured party must have a possible remedy against both the party seeking contribution and the party from whom it is sought. *Troutman* v. *Modlin,* 353 F. 2d 382 (8 Cir., 1965); *Cox* v. *Maddux,* 255 F. S. Supp. 517 (D.C. Ark., 1966). See also, *C & L Rural Elec. Coop. Corp.* v. *Kincaid,* 221 Ark. 450, 256 S.W. 2d 337; Annot. 26 ALR 3d 1283 (1969). It is clear that these minor plaintiffs had no remedy against their parents. *Rambo* v. *Rambo,* 195 Ark. 832, 114 S.W. 2d 468; Woods, Family Torts in Automobile Cases, 13 Ark. L. Rev. 299 (1959).

Likewise, we have found no basis for indemnity. The right to indemnity, where one of the two parties is not liable to the injured party for the joint wrong, must be based upon a relationship other than that of joint tortfeasors. *Jack Morgan Construction Co.* v. *Larkan,* 254 Ark. 838, 496 S.W. 2d 431. See also *Citizens Coach Co.* v. *Wright,* 228 Ark. 1143, 313 S.W. 2d 94.

Appellant argues vehemently that she was entitled to a

directed verdict, and we are sharply divided on the question. A majority of the court is of the opinion that there was substantial evidence that appellant, the driver of the motor vehicle that struck the minibike on which the children were riding, was guilty of negligence that was a proximate cause of the injuries of the children and that we cannot say that her negligence did not exceed the negligence of the children or that of the parents, as a matter of law. The question is a close one and a part of our difficulty arises from the fact that the Curry boy's testimony was almost exclusively by affirmative and negative answers to leading questions on direct, as well as cross, examination. We are well aware of the reasons for permitting direct examination of children of tender years by leading questions, but we also know that such children are often able to relate incidents in which they are involved with some degree of clarity and sometimes more accurately and vividly than when simply giving affirmative and negative answers. Be that as it may, there is evidence tending to show that Mrs. Welter did not act as a reasonably careful person would under similar circumstances.

Ramsey's Grocery is on the east side of Highway 95 on which Mrs. Welter was driving south. There is a county gravel road south of the grocery which intersects Highway 95, with a slight jog to the south, and continues west toward the Curry residence. It is the road taken to the grocery by the Curry children. As they prepared to enter the intersection for their return home, cars were parked west of the gas pumps and outside the canopy which extended from the front of the Ramsey Grocery to the gasoline pumps. One of them was a "panel truck" parked near the pavement on Highway 95. The Curry youth said he was south of these vehicles approaching the highway crossing from a point north of the county road and, when he was unable to see to the north beyond the panel truck, pulled the front tire of the minibike onto the paved highway, stopped, and saw the Welter car approaching from his right "kind of fast" but was unable to back up and was struck almost immediately. Although he said that he only went about a foot on the pavement, the physical facts show that the minibike was further west than that on the paved highway when struck. Young Curry said that, when he first saw the Welter car, it started crossing over the highway toward him. He did not remember being struck.

In order to cross the highway from the point young Curry entered it, it would be necessary for him to cross at an angle to the south or his left. The investigating state trooper found skid marks made by the automobile commencing in the southbound traffic lane slightly north of a stop sign east of the highway and north of the county road governing traffic approaching the highway from the east. The skid marks veered to the east from the very beginning, and could be traced into the yard of the Kendrick home just south of the intersection and east of Highway 95, where the automobile came to rest, headed southeast by east at almost a right angle to its direction of travel with the totally destroyed Honda Bike and the little girl under it. The westernmost skid mark, or that made by the right wheel of the automobile, was unbroken on the pavement for a distance of 37 feet 8 inches. The easternmost skid mark, made by the left wheel of the Welter vehicle, was broken. The first segment was 26 feet long. After a skip it continued on the same arc for another 21 feet 9 inches. There was a gouge mark in the pavement at the end of the westernmost skid mark and about the middle of the second, or southernmost, portion of the easternmost skid mark. There was no debris left in the southbound traffic lane. There were no gouge marks in the southbound traffic lane. The gouge marks described by the investigating trooper commenced near the east edge of the pavement in the northbound traffic lane and continued to the edge of the pavement and into the area under the car where it came to rest.

Mrs. Welter testified that she had never travelled over 50 miles per hour on Highway 95 and that she slowed down a "tiny bit" as she approached the Ramsey Grocery because of the cars parked there. She said that when she first saw the minibike, it was right on the edge of the highway and she was in front of the store, and she could not tell whether it was stopped or moving, but that in a split second it came across the road in front of her.

It was not unreasonable for the jury to believe that Mrs. Welter approached the intersection at an excessive speed for the conditions then existing and that she did not maintain a proper lookout and control of her vehicle, particularly in view of the fact that it might be deduced from the physical facts that the minibike was struck near the edge of the pavement in

the northbound traffic lane. It would be difficult to explain how this could have happened, if the vehicle were under proper control. To say the least, we cannot say that the Curry boy's version of the incident is either physically impossible or inherently improbable.

Since we find error in the judgment in favor of James Curry, Jr., but not in that in favor of Jeanna Curry, we are faced with the difficult problem of disposing of the judgment in favor of their parents. The jury returned a verdict in their favor for $15,000 for their damages on account of the injuries to both children. They sought damages for the children's medical bills, the loss of their services, and the mother's care and nursing during their recovery. A review of the record reveals no means of ascertaining what part of this verdict was attributable to the injuries to James, Jr. and what part to Jeanna.

Our cases on the subject do not seem to reach the question of the effect of a reversal of a judgment in favor of a minor upon the judgment in favor of the parent. We have said that they are independent causes of action. See *Ennis* v. *Brainerd,* 240 Ark. 16, 397 S.W. 2d 809. Yet, we have analogized the situation of a parent and a child seeking to recover from an alleged tortfeasor to that where an injured party seeks recovery from an agent and principal in that a verdict in favor of the agent exonerates the principal, because the agent is the primary party and the principal is the secondary party, i.e., liability of the principal is based wholly upon negligence of the agent. *Pigage* v. *Chism,* 237 Ark. 873, 377 S.W. 2d 32. By this analogy, we held that an injured child could not claim advantage of inconsistent verdicts allowing his parents recovery but holding against him as to liability, saying that the minor was asking that the "tail wag the dog." Although the defendant there was willing to accept the inconsistent verdicts, we said in dictum that the defendant could have complained, in which case, presumably, the dog would wag the tail, as we said that the verdict in the case of the primary party was the controlling verdict. This decision definitely puts us in the category of jurisdictions that recognize that the causes of action are independent but that the independent cause of action of the parents is for consequential damages,[1] and

---

[1] See 59 Am. Jur. 2d 212, Parent & Child, § 112; *Shiels* v. *Audette,* 119 Conn. 75, 174 A. 323, 94 ALR 1206 (1934), cited with approval in *Pigage.*

secondary, and that of the child primary.

There is an analogy to the situation where husband and wife have causes of action against a tortfeasor for injuries to the wife. We have classified the husband's cause of action for loss of consortium and for medical expenses as derivative and subject to the defense of comparative negligence of the wife, and to the bar of a judgment adverse to the wife on her cause of action, even though the causes of action may be prosecuted independently. *Lopez* v. *Waldrum Estate,* 249 Ark. 558, 460 S.W. 2d 61. Of course, the parents' right of action is somewhat similar to that of the husband for personal injuries to his wife. 59 Am. Jur. 2d 211, Parent & Child, § 112.

From the above holdings, we definitely fall into that category of jurisdictions having the rule that a parent cannot recover on his cause of action unless the child can recover on his cause of action arising out of the same negligent act of the party against whom both seek recovery and that the child's contributory negligence may be asserted against the parents, even though that negligence is not imputable to them. See *Shiels* v. *Audette,* 119 Conn. 75, 174 A. 323, 94 ALR 1206 (1934) (quoted with approval in *Pigage,* supra); *Dudley* v. *Phillips,* 218 Tenn. 648, 405 S.W. 2d 468, 21 ALR 3d 462 (1966); *Callies* v. *Reliance Laundry Co.,* 188 Wisc. 376, 206 N.W. 198, 42 ALR 712 (1925); *Fekete* v. *Schipler,* 80 N.J. Super. 538, 194 A. 2d 361 (1963); *Jones* v. *Schmidt,* 349 Ill. App. 336, 110 N.E. 2d 688 (1953); *Tidd* v. *Skinner,* 225 N.Y. 422, 122 N.E. 247, 3 ALR 1145 (1919). See also, 67 CJS Parent and Child, §§ 41a, 45, 47, pp. 742, 748, 752; 59 Am. Jur. 2d 222, Parent & Child, § 121; Restatement, Law of Torts, § 703.

In spite of the fact that the errors which require reversal of the judgment against the son relate to damages only, on remand, a new trial on all issues, including that of the negligence of the boy as a proximate casue of the injuries is required. Because we cannot separate the damages awarded the parents for the injuries for the two children, we must set aside the judgment in favor of the parents in its entirety. See *Clark* v. *Arkansas Democrat Co.,* 242 Ark. 497, 413 S.W. 2d 629.

The judgment in favor of James Curry, Jr. and the judgment in favor of James Curry and Sharon Kay Curry, as

father and mother and next friends of James Curry, Jr. and Jeanna Curry, are reversed and the cause is remanded for a new trial as to these parties.

Mr. Justice GEORGE ROSE SMITH and Mr. Justice BYRD would reverse all judgments and dismiss the action.