GASTER v. HICKS.

Opinion delivered March 10, 1930.

*Roscoe R. Lynn* and *June P. Wooten*, for appellant.

*Sam T. Poe, Tom Poe* and *McDonald Poe*, for appellee.

BUTLER, J. This suit was brought by the appellee to recover damages for personal injuries claimed to have been received while working in the employ of R. L. Gaster, now deceased, which injuries were received on June 3, 1925. The appellee was working on a grader used to spread gravel upon the highway, the grader being drawn by a tractor, and in attempting to start the tractor the

appellee's arm was caught in a large fly-wheel attached to the same, and was so badly injured as to render it useless and deformed. The appellee seeks to hold the appellant liable because of appellant's failure to furnish him reasonably safe equipment with which to work, in that, first, the tractor had been equipped with a cranking device which, at the time of the injury to the appellee, was out of repair and not being used, and that the appellant's failure to maintain such cranking device made the tractor dangerous to start; and, second, the ignition and timing device was not properly arranged, the result of which was to cause the tractor to improperly function in starting; that these defects were unknown to the appellee, and were not of such an obvious character as to impute to him the knowledge of their unsafe condition.

The appellant denied any defect in the equipment or negligence on his part and pleaded contributory negligence and assumption of risk on the part of the appellee, and alleged that the negligence, if any, was that of appellee's fellow servant for which appellant was not liable.

It may be said that prior to the institution of the suit, R. L. Gaster, appellee's employer, died, and this suit was brought against Dorothy E. Gaster, as administratrix. Appellant's intestate was engaged in building a gravel highway, and the appellee was employed by him as a grader operator. Appellee reached the place where he was to work on June 2nd, and there found the Rumley tractor, which was to pull the grader, being worked on. Appellee assisted to some extent the mechanic and one Fowler, the tractor man, and in the afternoon, after some repairs had been made on the tractor, they tested it to see if it could be started and found that it would run. At the time the tractor had no starting device, and this made it necessary for whoever "cranked" it to do so by standing in front of the flywheel, between it and the front of the tractor, and pull the flywheel over. This was done by grasping it with the hands and pulling it forward so that it would revolve, and this was called "cranking" the

tractor. Several cranked it on the afternoon of June 2d and also in the forenoon of June 3d, including appellee, when it would start all right. When Fowler, who was running the tractor, and the appellee got ready on the afternoon of June 3d to start on their work, Fowler operated what was called the "choke"—an equipment with which to let the gasoline into the proper part of the mechanism so that it might explode when the wheels turned. Appellee started to crank the engine in the usual way, when, for some reason, as the engine began to run, appellee's arm was caught in the flywheel and was broken and badly mangled.

As to just how this injury occurred, the testimony is in conflict. It was agreed that one of the witnesses who was absent would testify, if present, that the injury was occasioned by appellee's foot slipping, causing him to fall forward with his hand into the flywheel just as he started the engine. This witness was Lowell Miller, who, the appellee testified, was about one hundred yards from the place of the accident handling some rock at the time of the injury. Fowler, the only other witness as to the manner of the accident, except the appellee, stated: "Hicks and I went to the machine to start our day's work after lunch. Mr. Hicks went around to crank the machine while I was choking it—it was the same as a car; it had a throttle with gas on it. In some manner his hand slipped, or, in other words, it got away from him and made a backfire. * * * In this instance it seems it happened that, instead of bringing it over the firing point, he brought it most to the top point, and instead of firing it turned backwards; it turned back, and this explosion ignited. Couldn't say whether he didn't turn it quite far enough or turned loose too quickly. The tractor kicked with me. His arm got caught on a part of the frame."

The appellee testified, in relating how the injury occurred, as follows: "After dinner was when it happened. It didn't seem to want to start. * * * I stood on the ground

and turned the flywheel to crank it; had seen Fowler crank it that way. * * * I had hold of the spoke and the wheel when it. fired and jerked out of my hands backwards. It came back, and that put my hand through the spokes—jerked it there. By jerking you it would throw you out of balance and throw you in there. I fell into the wheel. My hand got caught between the spoke and the cross-bar; that is, the side part of the frame. Really, I don't know where it was caught, whether it was on the frame or inside of the water pipe or cooler. Had my hands way down by this thing when it happened. My hands were close to the frame when it fired and went back the other way. I don't know how far it went around.''

The above is substantially all of the testimony relative to the circumstances attending the operation of the tractor at the time of the injury, and the manner in which said injury occurred.

Ellis was in charge of the job and testified, among other things, that the tractor had a starting device, but that it was out of order. Fowler stated, in one part of his testimony, as follows: ''I was under the impression that it had a safety cranking device on it. You see, this has been about four or five years ago, and my memory on some things isn't good, but the same model tractor I had operated before this one was equipped with a safety cranking device.'' And later on in his testimony he was asked if he had examined a tractor that had been shown him the day before he testified, and he stated that it was the same tractor in use at the time of the accident; that it was the same tractor; that he identified it by a camshaft that he had put in there, and that there were lots of parts missing—removed from the tractor; that on examining the flywheel he did not find any notches or lugs on the inside, and that he had been under the impression that it had starting lugs on it, but when he went out to the machine on the day before testifying he found it had no lugs. ''I believe it did have on the other machine, and

I was of the impression that this one did too. I can be mistaken about it.''

The tractor was a six-thirty model, and Joe Lyon, a salesman for the Runley people, introduced a catalogue showing the lugs or indentations on the inside of the flywheel in which a part of the starting device fitted when a tractor was so equipped, and this witness stated that some six-thirty model tractors had starting devices on them and some did not; that he had examined the flywheel of a tractor shown him the day before the giving of his testimony represented to be the tractor in use at the time of the injury, and that the flywheel had no notches in which the end of the arm of the safety device would be inserted when it was being used to start the tractor. The witness stated that, when the starting device was in use, the tractor could be started without one having to put his hands upon the flywheel or coming in contact with it.

The testimony was given on the 13th day of March, 1929. The tractor was used after the accident in June, 1925, until sometime in August of that year, when it was set aside and had not been used since. The evidence shows that the tractor was old and worn and had to be continuously repaired in order to keep it in working order, and that on the day before the injury to the appellee it was being repaired and the timer was being adjusted. The evidence shows that the ignition system was poor, Fowler explaining that, if it had not been, the tractor could have been started easily by one individual, but that it required, in its condition, the efforts of two to get it started. A gasoline engine mechanic was doing the repair work, and Fowler was helping him. The extent to which the appellee assisted was to hand them tools or parts as required. The mechanic did not testify, but Fowler stated that a change was made from a low tension to a high tension magneto, and the spark was accelerated to fire a little early to get more power; that the timing mechanism, the ignition and the magneto on the tractor were not visible; that a ''backfire'' is where the spark is

advanced, and when you crank it fires early, and instead of turning the right way or forward, it turns backward—it is simply where the spark is advanced too far, and it fires before the piston gets in the right position.''

F. A. Ussery was called as an expert witness and testified that he had been in the automobile repair business for twenty-three years, and had had experience with internal combustion gas engines. He was asked this question:

''Q. I wish you would tell the jury what the effect of setting up the timing gears on one of the internal combustion engines is as to whether it is likely to cause backfire more frequently than if retarded? A. Well, did the magneto have a spark control on it? Q. It had an impulse starter on it. A. It had an impulse starter but no spark control? Q. No, no spark control. Well, in timing an engine of that kind a man should be pretty careful to get his pistons at the proper place, his valves at the proper place, in order to determine when it is in time.''

Continuing his testimony, the witness stated, ''There wouldn't be any difference in a low-tension magneto and a high-tension magneto. Any time you put an impulse starter on any kind of machine, it clearly indicates to you, or any other man, that that car is hard to start. In other words, the compression is so great that a man can hardly turn it over or get momentum without it kicking back on him. By putting an impulse starter on there, or a car—an automobile gas engine—they are a danger to a man cranking that car any time, and he wasn't careful in pulling up on the crank—even if he moved it slow—even a Ford car you retard the spark and pull up the crank. You pull up slow on it. The piston will get to the top, and there will be a variation in time—in fact, it would backfire before it goes there itself, and it is likely to kick back at the top of dead center as to go the other way.'' He further stated that if the timing mechanism is set to fire before it gets to dead center, it is bad; that ''that is not backfire—it is firing too early; it comes back. If it fires before it gets

to dead center, it will reverse itself, and the crank will run around with the motor." He further stated, in speaking of cranking a tractor which might backfire, that if one was accustomed to the motor, or tractor, and if he is a pretty good gas engine man, he might "rock it" on compression and get by, and that if an engine fired too early, or backfired, it was because of some fault in the timing mechanism.

There was other testimony introduced tending to show that gasoline engines would backfire without any apparent cause, and there were circumstances narrated by the witnesses as to the blood on the tractor in question after the injury which indicated that, when said injury occurred, the flywheel was not going backward, but forward. The testimony, as abstracted, is fragmentary, and indeed that appears to be true when the record is examined. Also the testimony is very meager as to just what was done with reference to setting the timing equipment, and as to whether or not the tractor in question had ever been equipped with a starting device. We have endeavored to gather from the disconnected statements of the witnesses their testimony relative to the question of the manner in which the injury occurred, and that relative to the starting device and the ignition. After a careful consideration of the testimony as abstracted, and as revealed from an inspection of the original record, we have concluded that there was substantial testimony upon which to submit the question of the negligence of appellant's intestate to the jury.

This court cannot weigh the evidence or pass upon the credibility of the witnesses, that being the sole province of the jury. The jury has found, by its verdict, that there was negligence, and in considering the evidence we must give to it its highest probative force in favor of the appellee and indulge every inference which is reasonably deducible from the testimony in support of the finding of the jury. Thus viewing the testimony, it may be said that there is substantial evidence to the effect that

the appellee was not experienced in the mechanism of gasoline tractors, and that, while he had worked for a number of years where tractors were used, his work was not of such character as to render him a skilled gasoline engine man. In fact, the reasonable inference is that he knew but little of them except that they would run. He was entirely unacquainted with the particular type of tractor that caused his injury, never having worked about one before. The tractors about which he had worked before were equipped with starting devices, and he did not know at the time of his injury whether the Rumley tractor which caused his injury had ever been equipped with such a device. The experience he had had with this tractor was only that acquired on the day before the accident when he had but a casual connection with the repair work being done upon it. Appellee had seen Fowler start the engine in trying it out on the afternoon of the 2d and perhaps in the forenoon of the 3d, and he himself had tried it out, starting it one or more times as he had seen Fowler do, each time the engine starting without a backfire. He knew nothing of the ignition or timing equipment. It was covered so that he could not observe it, and, if it had not been covered, his experience and knowledge of such equipment would not have been sufficient to apprise him of any existing defect.

It is manifest that the tractor was old and worn and required constant attention in order to make it run, and, if the starting equipment had been attached to the tractor, it could have been started without danger to the operator, or if the ignition had been in good condition, the tractor man could have started it without aid of the appellee, who was the grader man. Because the tractor was old and worn, the timing equipment was so arranged as to make it "fire early," the reason for this being that by so doing the engine would operate with more power, and this made the starting of it a dangerous operation. For, by firing early, the electric spark was emitted and exploded the vaporized gasoline before the piston reached

a point known as "dead center," which would have a tendency when the explosion occurred to cause the wheels to revolve the wrong way—that is, to go backward instead of forward. One acquainted with a particular engine in this condition and so timed, by using care and "rocking it" at a particular point could start the engine without injury to himself. When the time came for the tractor man, Fowler, to start the tractor attached to the grader which was to be operated by the appellee, it became necessary for him to have appellee's assistance in order to get his engine started, and this the appellee conceived to be, and in fact it was, his duty. He went to the flywheel at a point where he had been shown, and where he had seen others take hold of it to revolve it or crank it, and in the course of that operation the engine fired too early, or backfired, causing the flywheel to suddenly revolve backward instead of forward, as it should have done, causing the appellee to fall forward, so that his arm was thrust between the spokes of the wheel and caught in some manner as the wheel revolved backward, breaking and mangling his arm. The jury concluded that this would not have occurred, had the wheel moved in the proper manner, and it did not so move because of the negligence of the appellant in not having the proper adjustment of the timing and ignition system on the tractor.

It is contended by the appellant that the injury resulted from the ordinary dangers incident to the operation, and that the appellee assumed this risk when he entered his employment. We fully agree with the appellant as to the rules of law governing the question of assumed risk, and that the rule cited is the one applicable to the facts of this case, but we draw a conclusion different to that of learned counsel. "The rule is well settled in this State that, when it appears to be clear that the servant has knowledge of and appreciates the dangers incident to the work, or that the danger is so obvious or apparent that knowledge of the danger and appreciation thereof should be imputed to him, then the court should

declare, as a matter of law, that the servant is not entitled to recover. It is equally well settled that assumption of risk is not predicable from knowledge of the conditions alone. It must further appear that the danger was, or should have been, appreciated by the servant in order that it may be said that there was an intelligent consent on his part. While the appreciation of the danger is often inferred from complete knowledge on the part of the servant, yet, if the knowledge possessed by the servant is not such as to necessarily make him appreciate the danger of his work, his action for injuries will not be barred." *Brackett* v. *Queen*, 162 Ark. 525, 258 S. W. 635, and a number of other cases cited in appellant's brief. We think, from an application of this rule to the testimony in the instant case, that it could not be said as a matter of law that it was clear that the appellee appreciated the danger incident to the cranking of the tractor. This was the first time he had ever worked about a tractor of this description; he was not aware that it had, at any time, been equipped with a safety device, and therefore could not have been aware that the engine might be dangerous to start without such device; he had only seen this engine started a very few times; he was not a gasoline engine mechanic, and there is nothing to show that he would have known, had he inspected the ignition system and timing equipment, that the same was not in good condition. Moreover, this equipment was all concealed, and, having just been overhauled by a skilled mechanic, the appellee had the right to assume that it was in proper working order, and that no danger would result to him therefrom. Therefore, the assumption of risk would not be predicable from a knowledge of these conditions, nor were they such that from the experience of the appellee he would, or could, have appreciated the danger, and it cannot be said as a matter of law that he had assumed the risk.

We think the question of the appellee's contributory negligence was properly submitted to the jury, and that it

was for the jury to say whether or not the appellee, from his knowledge of cranking a Rumley tractor, was careless in the manner in which he undertook to do so. The testimony of one of the witnesses, if believed, might have led to the conclusion that the appellee was negligent, and that because of such negligence he slipped and fell into the flywheel, and that the injury was occasioned by that and not by the backward movement of the flywheel. But there was testimony that this witness was a hundred yards away from the accident, and also testimony contradicting his statements, so that it was for the jury to determine this issue. It cannot be said, as a matter of law, that in attempting to crank the tractor in question the appellee did not undertake the operation as an ordinarily careful and prudent man would have done under similar circumstances.

The court fully and fairly instructed the jury on the questions of negligence, assumed risk and contributory negligence, none of which instructions are complained of, but it is contended that the court erred in refusing to give appellant's prayer for instruction No. 15, as follows: "You are instructed that the defendant is not responsible for the negligence of a fellow servant or employee, even in the event you find that such negligence may have been proven in this case."

It was not error to refuse the above instruction for the negligence complained of and proved, if any, was not the negligence of a fellow servant, but of the master himself. If it had been some negligent act of Fowler at the time of the injury which in any way caused the appellee to fall into the flywheel, then the instruction would have been proper, but the negligence, if any, was in the failure of the master to furnish reasonably safe machinery with which to do the work. This is a duty of the master, which he cannot delegate so as to avoid liability. *Bryant Lumber Co.* v. *Stastney,* 87 Ark. 321, 112 S. W. 740.

All of the questions noted were dependent upon conflicting testimony, and submitted to the jury under proper

instructions. The rules of law governing are so well settled as to render the citation of authorities unnecessary.

As we view this case, it depended merely on questions of fact which, on substantial testimony, have been settled by the jury adverse to the contentions of the appellant.

It is evident that the testimony of Fowler as to the repairs on the tractor other than that to the timing mechanism, if improper, was not prejudicial, because it was shown that such repairs had no connection with the defects complained of, and there was other testimony introduced, without objection, relative to the same matter.

We do not deem it important to discuss the objections made to the testimony of the witness Eshe, because it is apparent from the record that his calculations were disregarded by the jury.

On a consideration of the whole case, we are of the opinion that the trial court committed no prejudicial error, and, giving the testimony its strongest probative force, there is some substantial evidence tending to support the verdict. The jury awarded appellee $15,000.

On the question of the amount of the verdict and judgment, there were three elements of damage to be considered by the jury—pain and suffering endured and likely to be suffered in the future, the embarrassment and humiliation from the maimed limb, and the loss of earning power. The pain and suffering in this case must have been intense and endured over a long period of time. From the testimony of the physician it is apparent that the appellee's arm can never be restored in any way approaching its normal condition, and that the bones are still not united and perhaps will never be. They are heard to grate as appellee moves his arm, and he testified, and it seems reasonably true, that he continues to suffer pain and perhaps always will. We cannot measure human suffering in dollars and cents, but we have in numbers of cases held that it entitled the sufferer to a substantial recovery in damages. The mental anguish appellee will suffer through the years is to be considered,

and it is clearly demonstrable from the testimony that the appellee is unfit to earn a living except by physical labor. We have only to apply common sense to the state of the case where a laborer has lost the use of his right arm to conclude that the injury to him is serious indeed. The evidence in this case shows that the appellee was a comparatively young man, strong and healthy, earning the equivalent of $5.00 a day. He was increasing in efficiency in his particular line of work, and his wages had been raised from time to time. Since he had been injured, he only has been able to earn very much less, and some of the money he has earned has been derived from casual jobs which we have no reason to believe will be permanent. We think it reasonably certain that the loss of the use of a laboring man's right arm—especially if he is a right-handed man—necessarily prevents him from following a vocation that would require any degree of skill, and he is reduced from the grade of a skilled or semi-skilled workman to take up those occupations that are called common labor. We see nothing in any of our former decisions that would compel us to reduce the judgment in this case, for, as pointed out in the case of *Missouri Pacific* v. *Elvins*, 176 Ark. 737, 4 S. W. (2d) 528, a dollar is worth much less than formerly, and a recovery of a sum held to be excessive some years ago would not necessarily mean that for a similar injury now such verdict would be deemed excessive. See cases cited in *Mo. Pac. Rd. Co.* v. *Elvins, supra*.

The judgment of the trial court is correct, and it is therefore affirmed.