LARSON MACHINE, INC., G & G
MANUFACTURING CO., and Bruce OAKLEY,
d/b/a OAKLEY FERTILIZER & CHEMICAL CORP.
v. Arnold WALLACE and Vada WALLACE

78-308                                        600 S.W. 2d 1
Supreme Court of Arkansas
Opinion delivered March 10, 1980
Supplemental opinion on denial of rehearing April 28, 1980

196

*Friday, Eldredge & Clark*, by: *Donald H. Bacon* and *Joseph E. Kilpatrick, Jr.*, for appellant Larson Machine, Inc.

*Gannaway, Darrow & Hanshaw*, for appellant G & G Manufacturing Co.

*Lightle, Beebe & Raney*, for appellant Bruce Oakley.

*Boyett & Morgan, P.A.*, for appellees.

JOHN A. FOGLEMAN, Chief Justice. Arnold Wallace and his wife brought this personal injury suit for damages for severe, serious, painful and permanent injuries to his right leg and foot. The original defendants were Larson Machines, Inc., a manufacturer who produced fertilizer spreaders, and G & G Manufacturing Company, the manufacturer of a power take-off shaft and safety shield which was a component of the fertilizer spreaders manufactured by Larson. Bruce Oakley, who, as Oakley Fertilizer & Chemical Corporation, sold fertilizer to Arnold Wallace and furnished him a fertilizer spreader purchased by Oakley from Larson was a third party defendant. On May 24, 1973, Wallace was distributing the fertilizer he had purchased from Oakley using a Larson fertilizer spreader he had obtained from Oakley for that purpose. He was pulling the spreader with a tractor and got off the tractor to make an adjustment. As he dismounted, his pants leg was caught in the power take-off shaft, which was not protected by a safety shield. As a result, his pants and boot were wrapped around the shaft and his foot and leg badly mangled.

In their original complaint the Wallaces had sought to recover from Larson and G & G for negligence and breach of implied warranties of merchantibility and fitness for a particular purpose in the design and manufacture of the safety shield. After a full trial, the jury returned a verdict on interrogatories propounded to it. The jury found that the damages Wallace had suffered amounted to $180,000 and ap-

portioned the negligence among the parties as follows: 40% to Arnold Wallace, 25% to Larson, 25% to G & G, and 10% to Oakley. It also found that Larson and G & G had breached various warranties to Wallace which were the proximate cause of his injuries, but did not find that Oakley had breached any warranties to Wallace. Judgment was ultimately entered on the verdict on May 18, 1978.

Due to the allegations of various bases of liability of the three defendants, the multiple cross-complaints among the defendants seeking indemnity and contribution from each other, and the many motions made during and after the trial, which took place in April, 1978, numerous complex questions arose during the trial and have been presented on these appeals by Oakley, Larson and G & G. In this opinion, we will first treat those points asserted by Oakley against the judgment in favor of Arnold Wallace and then proceed to the points raised by Larson and G & G that are material to the disposition of the case as to the Wallace judgment. Thereafter, we will take the remaining issues between Oakley, on the one hand, and Larson and G & G on the other. Where the questions relate to the evidence deduced, we will of course view the evidence in the light most favorable to the Wallaces, drawing all inferences reasonably deducible in their favor. Where there are conflicts in the evidence, we will remember that the jury resolved them, and all questions of credibility, against the appellants.

Oakley contends that the trial court erred in overruling his motion to dismiss the Wallaces' amended complaint against him. The motion asserted that the Wallace cause of action against Oakley was barred by the three-year statute of limitations.

As pointed out above, the Wallaces alleged that Arnold Wallace suffered his injury on May 24, 1973. They did not file suit until November 13, 1974. In the complaint then filed Larson was the only defendant. On June 11, 1975, the Wallaces amended their complaint to make G & G a defendant along with Larson. Oakley was not a party to the action in any capacity before September 5, 1975, when G & G filed a third party complaint against him, alleging that, if the safety shield was missing when the fertilizer spreader was leased to

Wallace, Oakley knew or should have known that it was and knew or should have known that the spreader, in that condition, was dangerous and unfit for use. G & G asserted that, if these allegations were true, the negligence of Oakley was a proximate cause of Wallace's injury. G & G sought indemnity from Oakley and contribution under the Uniform Contribution Among Joint Tortfeasors' Act. Larson responded to that pleading by filing, on September 23, 1975, a response which included a cross-complaint against Oakley, stating that if Arnold Wallace was damaged as alleged, the damages were caused by the negligence of Oakley and that Oakley was liable to Larson by way of indemnity or contribution on any damages recovered against Larson. Oakley then filed a general denial of the allegations of the third party complaint of G & G and the cross-complaint of Larson. In that pleading, he asserted that Arnold Wallace was contributorially negligent, in addition to alleging that the protective shield manufactured by G & G was defective in design and manufacture and that Larson knew, or should have known, of the potential hazard, but failed to test the shield or to provide adequate warning.

It was not until September 27, 1977, that the Wallaces asserted any cause of action against Oakley. On that date, they filed their complaint against Oakley, as a third party defendant, alleging that Oakley had been brought into the suit by G & G and adopting, by reference, all of their allegations as to liability of the original defendant, as allegations of liability on the part of Oakley. Obviously, this pleading, filed more than four years and four months after the date the Wallaces alleged that Wallace was injured, asserted a cause of action which was barred by the three-year limitation of Ark. Stat. Ann. § 37-206 (Repl. 1962), if that statute applies, and if it cannot be said that the cause of action had been asserted against Oakley within three years after May 24, 1973.

Oakley promptly filed a motion to dismiss the complaint of the Wallaces against him, pleading the three-year statute of limitations as a bar to any cause of action they had against him. Oakley argues that the statutory period continued to run until the Wallaces filed their "Complaint against Third-

Party Defendant," relying upon such cases as *Bridgman* v. *Drilling*, 218 Ark. 772, 238 S.W. 2d 645, where third party practice was not involved. However logical Oakley's arguments may seem, they are inconsistent with a prior holding of this court. In their original complaint, the Wallaces had alleged that the fertilizer spreader, a Model 815 Broadcaster, was in a defective condition, which was unreasonably dangerous to Arnold Wallace at the time it was distributed. Similar allegations were made in the amendment to the complaint of the Wallaces by which G & G was made a party defendant. Under Ark. Stat. Ann. § 34-1007 (Repl. 1962), one who is a third party defendant under the Uniform Contribution Among Joint Tortfeasors Act [Ark. Stat. Ann. § 34-1001 et seq (Repl. 1962)] *shall* make his defense to the complaint of the plaintiff and to the third party complaint *in the same manner as defenses are made by an original defendant to an original complaint.*

In *Chapman Chemical Co.* v. *Taylor*, 215 Ark. 630, 222 S.W. 2d 820, a landowner and his tenant filed suit against Elms Planting Company for damages to their cotton crop occasioned by the use of a chemical dust by the planting company in spraying its rice crop. Elms Planting Company filed a cross-complaint against Chapman Chemical Company, alleging that if Elms Planting Company was in fact liable in any amount, the Chemical Company, if not primarily and solely liable, was at least a joint tortfeasor. The Planting Company invoked the provisions of Act 315 of 1941 (Ark. Stat. Ann. § 34-1001 et seq). The Chemical Company had not been made a defendant in the original suit of the plaintiffs, who filed a motion to dismiss the suit against the Chemical Company. This motion to dismiss was overruled and the Chemical Company moved to dismiss upon the ground that Act 315 had no application because it had no liability to the plaintiffs. This motion was also overruled. The case proceeded to trial and a verdict was rendered in favor of plaintiffs against the Chemical Company but against the plaintiffs on their claim against the Elms Company. On appeal, the Chemical Company insisted that there was error in joining it in the suit against the Elms Company because, since it was not named as a defendant by the plaintiff and no relief was prayed against it, the Uniform Contribution Among Joint Tortfeasors Act did not authorize this action. This court sustained the judgment against the Chemical Company, even though the judgment in favor of the Elms

Company was also affirmed. We pointed out that under Act 315 a defendant seeking contribution may serve a complaint upon a person not a party to the action who is or may be liable as a joint tortfeasor to him or to the plaintiff for all or part of the plaintiff's claim against him. We said:

> Here the injured parties, the original plaintiffs, do not concede that they have no cause of action against the third party defendant, the Chemical Co. On the contrary, it is asserted that the plaintiffs did have and now have a cause of action against the third party defendant. Plaintiff's contention is that they had a cause of action against the Elms Co. on which they were content to rely, and they did not elect to complicate that case by making the Chemical Co. a party. But it said in cross appellant's brief, that now that the Chemical Co. has been made a party, although not on their motion, the judgment against the Chemical Co. should be affirmed. Indeed the position of the cross appellants, the original plaintiffs, is that not only should the judgment against the Chemical Co. be affirmed, but that the judgment against the Elms Co. should be reversed for the reason that under the undisputed testimony its liability as well as that of the Chemical Co. was established.***

It is true, as Oakley argues, that the statute of limitations was not involved there. The important thing, however, is that the original plaintiffs in that case never filed any pleading against the Chemical Company. They were entitled to judgment against the Chemical Company on the basis of the allegations of the complaint against the original defendant and those of the third party complaint against the Chemical Company, as third party defendant. We quoted and relied upon a statement from *Baltimore Transit Co.* v. *State,* 183 Md. 674, 39 A. 2d 858, 156 ALR 460, that a statute authorizing a defendant to implead a third party defendant applies only when there is a common liability to an injured person in tort, and is inapplicable where the injured person has no right of action against the third party.

There are some cases holding that the period of limitations continues to run until the plaintiff actually amends

his pleadings to assert a cause of action against a third party defendant. See *Lommer* v. *Scranton-Spring Brook Water Service Co.,* 3 FRD 27 (M.D. Pa. 1943); but see same case 4 FRD 104 (M.D. Pa. 1944); *Hankinson* v. *Pennsylvania Railroad Co.,* 160 F. Supp. 709 (E.D. Pa. 1958); *Carlise* v. *Monongahela Railway Co.,* 16 FRD 426 (W.D. Pa. 1954); *Horan* v. *Pope & Talbot, Inc.,* 119 F. Supp. 711 (E.D. Pa. 1953). Some courts have held that the original plaintiff has a choice as to whether he will amend his pleadings to seek relief against the third party defendant and that the plaintiff cannot recover against a third party defendant without having amended his pleadings to assert a cause of action against that third party defendant. *Salazar* v. *Murphy,* 66 N.M. 25, 340 P. 2d 1075 (1959); *Thompson* v. *Cranston,* 2 FRD 270 (W.D. N.Y. 1942) (and cases cited therein). Most, if not all of them, are based upon a rule or statute different from ours in important respects. While our statute permits the filing of a third party complaint against one "who is or may be liable as a joint tortfeasor to him or the plaintiff,[1]" it also provides that the plaintiff "shall" amend his pleadings to assert any claim against the third party defendant that he might have asserted had he joined the third party defendant as a defendant in his original complaint. Our statute specifically makes the adjudication of the third party defendant's liability to the plaintiff binding upon the third party defendant. Ark. Stat. Ann. § 34-1007 (Repl. 1962). Our statute is different from those patterned after Rule 14 of the Federal Rules of Civil Procedure, under which the plaintiff "may" amend his pleadings to assert a claim against the third party defendant, and the effect of the adjudication of the third party's liability is declared by our statute. See *Monarch Motorists Industrial Corp.* v. *American Motorists Insurance Co.,* 276 F. Supp. 972 (D.C. N.Y. 1967). Therefore, we must conclude that the decision in *Chapman Chemical Co.* v. *Taylor,* supra, is a proper construction of our statute and that the statute of limitations ceased to run at least as early as the filing of Oakley's answer.

When the third party complaint alleges a direct liability of the third party defendant to the plaintiff on the claim set

[1] *Applegate* v. *Riggall,* 229 Ark. 773, 318 S.W. 2d 596.

out in the plaintiff's complaint, the third party "shall" make his defenses to the complaint and no amendment to the complaint is necessary or required, and the parties are at issue as to their rights respecting the claim without any amendment of the complaint by the plaintiff. *Atlantic Coast Line R. Co.* v. *United States F. & Guaranty Co.*, 52 F. Supp. 177 (M.D. Ga. 1943); *Lommer* v. *Scranton-Spring Brook Water Service Co.*, 4 FRD 104 (M.D. Pa. 1944). See also, *F & D Property Co.* v. *Alkire*, 385 F. 2d 97 (10 Cir. 1967).

The Wallaces did not originally assert a cause of action against Oakley, but they would have been entitled to judgment against Oakley under the rule in the Chapman Chemical Company case even if they had never filed a pleading against him. Because the duty of Oakley to defend against the allegations of the Wallaces, in the complaints against Larson and G & G, existed at the time Oakley was served with the pleadings, and because three years had not then elapsed after Arnold Wallace was injured, the cause of action was not barred by the statute of limitations.

Oakley next contends that recovery by the Wallaces was barred because Arnold Wallace assumed the risk of injury inherent in the use of the fertilizer distributor in the condition it was when he was injured. Larson and G & G also raise this issue.

Arnold Wallace was 49 years of age. He divided his time between his occupation as a carpenter and work on a cattle farm he had owned for 10 to 20 years. On the day before his injury, he picked up a Parson fertilizer spreader at Oakley's place of business. Oakley told Wallace that he would have to return the spreader by 8:00 a.m. the following day. Since the power take-off shaft was on the front of the fertilizer spreader, the shaft was raised to a vertical position when being transported as it was by Wallace. The spreader was attached to the rear of Wallace's pickup truck by employees of Oakley. Wallace did not examine the spreader, but assumed that it was "okay." On the way to the farm, nothing fell off the spreader. Wallace's son was waiting for him when he reached the farm. While Arnold Wallace went into his house to change his clothes and eat a sandwich, his son disengaged the

spreader from the pickup truck and hooked it onto a Moline "rice-type" tractor, which is "built low to the ground," and has a permanent draw bar and power take-off shaft at the rear. Unlike other types of tractor, the operator of this tractor must mount and dismount from its rear. The draw bar is fixed and part of it is underneath and near the middle of a platform at the rear of the tractor. One mounting or dismounting this tractor steps on this platform. The power take-off shaft is located in the middle of, and four to six inches above, a step at the rear of the tractor used for mounting it. The step is about 14 inches deep and three feet long and 18 inches above ground level. There is about 18 inches clearance on the step on each side of the shaft. One sitting on the seat is directly above the power take-off shaft. There were "handholds" on the rear of the tractor to facilitate the operator's mounting and dismounting. Wallace's son had never pulled a fertilizer spreader before and did not know that there should be a shield on the power take-off shaft.

As soon as Arnold Wallace had eaten, he went outside and, driving another tractor to which a disc and harrow were attached, followed the fertilizer spreader being pulled by the tractor his son was driving, until 7:00 or 7:30 p.m. Nothing fell off the spreader during this time. Since there were about four or five acres which had not been fertilized when the Wallaces had to stop on account of approaching darkness, Arnold Wallace arose about 6:00 a.m. the next morning and undertook to complete the operation in time to return the spreader at 8:00 a.m. At about 7:15 a.m. the machine stopped dropping fertilizer, so Wallace stopped the tractor in order to take it out of gear and let the power take-off shaft swing. Although Arnold Wallace had many years experience in operating farm equipment with power take-off shafts, this was the first Larson fertilizer spreader Wallace had ever used. Since he was unfamiliar with it, he left the power take-off turning "real" slowly, dismounted the tractor, and went to the rear of the fertilizer spreader, knowing that the fans which spread the fertilizer were not turning. He recognized that a chain was off a sprocket, which was turning very slowly. He used a screwdriver to replace the chain on the sprocket, and then remounted the tractor to finish the fertilizing. After going a short distance, an identical

malfunction occurred, so Wallace commenced a repetition of his earlier procedure. He had taken the tractor out of gear, left the power take-off running very slowly, stepped down on the platform with his right foot off the seat, attempting to "back out," put his left foot on the platform, and his right foot on the ground and then his britches leg became caught in the power take-off shaft, as a result of which his britches leg and boot were wound around the shaft and ligaments and tendons were torn from his foot and leg.

Wallace never realized that there was not a safety shield on the power take-off shaft on the fertilizer spreader until he was caught in it. All the power take-off shields on his own equipment were metal or of the same color as the equipment. He had never seen a plastic safety shield on a power take-off shaft. Although the power take-off shaft was only 18 inches from him as he operated the equipment, he did not ever look at it before the accident. Wallace testified there was no reason to look at, or check, the shaft as long as it was operating properly. He said that Oakley had a reputation for furnishing good equipment and Wallace assumed that the spreader was "field ready," i.e., ready for work, with all shields in proper place and all universal joints in proper order. Wallace said that he was in a hurry because Oakley had given him a deadline for the return of the spreader.

When Wallace had stepped off the tractor, he was about 18 inches away from the shaft. Wallace had known that if he got into the power take-off shaft, he would get hurt. He had heard almost every year about someone being killed or hurt in a power take-off shaft. He knew that there was some danger if the shield was not in place. He said there was no way one could get off the tractor without stepping near the power take-off shaft. He left the shaft running intentionally, so he could see what had happened when the equipment quit distributing fertilizer. A hand clutch which engages and disengages the power take-off is located near the rear of the tractor. It can be operated either from the tractor seat or the ground. To stop the running of the power take-off shaft, all that was necessary was to "hit" the hand clutch. There was a shield on the power take-off shaft on the tractor. He intentionally and deliberately left the power take-off shaft in gear

the second time there was a malfunction in order to facilitate the replacement of the chain on the sprocket.

There is no doubt that the evidence that Arnold Wallace was negligent is more than substantial, and the jury so found. This does not mean that he assumed the risk as a matter of law. The question of assumption of risk is generally one of fact for the jury. *Haynes Drilling Corp.* v. *Smith,* 200 Ark. 1098, 143 S.W. 2d 27. The question here is not whether Arnold Wallace should have known that the safety shield was missing. It is not sufficient that he knew that leaving the tractor in gear so the power takeoff shaft would continue turning would be hazardous if the safety shield was not in place. In order to say that he assumed the risk as a matter of law, we should have to say that, under the undisputed evidence, with all reasonable inferences drawn in favor of Arnold Wallace, intelligent persons could only conclude Arnold Wallace actually knew that the safety shield was not in place and actually appreciated the inherent danger as a result of its absence at the time he dismounted from the tractor after having failed to disengage the clutch that caused the power from the tractor to turn the power take-off shaft. *Hudgins* v. *Maze,* 246 Ark. 21, 437 S.W. 2d 467; *Bugh* v. *Webb,* 231 Ark. 27, 328 S.W. 2d 379; *Haynes Drilling Corp.* v. *Smith,* supra; *McDonald* v. *Hickman,* 252 Ark. 300, 478 S.W. 2d 753. Of course, Arnold Wallace could be said to have assumed the risk as a matter of law if the danger was so obvious or apparent that knowledge and appreciation thereof should be imputed to him. *Brackett* v. *Queen,* 162 Ark. 525, 258 S.W. 635; *Gaster* v. *Hicks,* 181 Ark. 299, 25 S.W. 2d 760; *Western Coal & Mining Co.* v. *Corkille,* 96 Ark. 387, 131 S.W. 963; *Hall* v. *Patterson,* 205 Ark. 10, 166 S.W. 2d 667. One cannot be heard to say that he did not know of a dangerous condition that was so obvious that it was apparent to those of ordinary intelligence. *Fullerton* v. *Henry Wrape Co.,* 105 Ark. 434, 151 S.W. 1005.

Oakley and the other appellants place great reliance upon *Spradlin* v. *Klump,* 244 Ark. 841, 427 S.W. 2d 542. There is one important difference. In *Spradlin* the moving rollers, which were essentially similar to those in a clothes wringer, were open and obvious. In this case, if the testimony of Arnold Wallace is to be believed, the absence of the safety

shield, the purpose of which was to protect one from coming into contact with the revolving power take-off shaft, was not open and obvious, even though he made no inspection. Wallace said that the safety shields on all equipment he had previously used had been the same color as the equipment. Nothing in the record that is abstracted shows that the absence of the safety shield was apparent to one of ordinary intelligence having the background of knowledge and experience that Wallace had. We think the question whether Arnold Wallace assumed the risk was for the jury.

Oakley also contends that the negligence of Arnold Wallace was an efficient independent intervening proximate cause. He contends that the act of Wallace in stepping into the shaft while the power take-off was still in operation due to his deliberate failure to disengage the shaft was completely independent of any misconduct of Oakley in furnishing the equipment without a safety shield. The question of intervening efficient cause is simply a question whether the original act of negligence or an independent intervening cause is the proximate cause of an injury. *Arkansas Power & Light Co.* v. *Marsh,* 195 Ark. 1135, 115 S.W. 2d 825. Like any other question of proximate causation, the question whether an act or condition is an intervening or concurrent cause is usually a question for the jury. *Helena Gas Co.* v. *Rogers,* 104 Ark. 59, 147 S.W. 473. See also, *Rhoads* v. *Service Machine Co.,* 329 F. Supp. 367 (E.D. Ark. 1971). We did find that there was such an independent intervening cause in *Cowart* v. *Casey Jones Contractor, Inc.,* 250 Ark. 881, 467 S.W.2d 710, upon which Oakley relies. In that case, however, the separate intervening cause was the continued use of a crane by a lessee with the knowledge that it lacked certain safety devices. The suit was brought by the personal representative of an employee of the lessee who was fatally injured when struck by the crane. It was brought against the owner of the equipment who had delivered it to the lessee without safety devices that would have prevented the injury to the lessee's employee. As we have pointed out, there is evidence in this case from which a jury could find that Arnold Wallace did not know that the safety device was not in place.

Proximate cause is the efficient and responsible cause,

but it need not be the last or nearest one. *Bennett* v. *Bell,* 176 Ark. 690, 3 S.W. 2d 996. The mere fact that other causes intervene between the original act of negligence and the injury for which recovery is sought is not sufficient to relieve the original actor of liability, if the injury is the natural and probable consequence of the original negligent act or omission and is such as might reasonably have been foreseen as probable. *Butler* v. *Arkansas Power & Light Co.,* 186 Ark. 611, 54 S.W. 2d 984; *Arkansas Power & Light Co.* v. *Marsh,* supra; *Hayes* v. *Missouri Pac. R.R. Co.,* 208 Ark. 370, 186 S.W. 2d 780. The original act or omission is not eliminated as a proximate cause by an intervening cause unless the latter is of itself sufficient to stand as the cause of the injury. *Butler* v. *Arkansas Power & Light Co.,* supra; *Arkansas Power & Light Co.* v. *Marsh,* supra. The intervening cause must be such that the injury would not have been suffered except for the act, conduct or effect of the intervening agent totally independent of the acts or omission constituting the primary negligence. *Arkansas Power & Light Co.* v. *Marsh,* supra; *Hayes* v. *Missouri Pac. R.R. Co.,* supra. In order for Oakley to have been relieved of liability by the negligence of Arnold Wallace, as a matter of law, we should have to say that Wallace's conduct was not reasonably foreseeable and merely possible, but not within the range of probability as viewed by the ordinary man. *Hayes* v. *Missouri Pac. R.R. Co.,* supra. We are not able to say this. As we understand the evidence, the basic purpose of the safety shield was to prevent persons who came in proximity to the shaft from coming into contact with it. It would be rather difficult to say that the likelihood that one such as Wallace would come in contact with the shaft in the absence of the safety shield was not foreseeable. It is also reasonable for one to conclude that Wallace would not have been injured had the safety shield been in place. Oakley's background in dealing with such an implement as this would certainly justify the inference that he knew or should have known of the probability of one such as Wallace being injured if the safety shield was not in place. Wallace testified that Oakley had told him, after the occurrence, that he was not sure whether there was a safety shield on the fertilizer spreader when it was delivered to Wallace, but if the shield was not in place, its absence was due to the fact that the spreader came with a very flimsy thin plastic shield that would not stay on the equipment for one trip to the field and that he and his employees had been unable to keep them on the equipment. This

question of intervening cause was for the jury.

Larson contends that the trial court erred in failing to direct a verdict in its favor for two reasons: (1) the actions of Bruce Oakley amounted to an independent intervening cause as a matter of law and (2) there was no proof that any negligence or breach of warranty proximately caused the Wallaces' damage.

As to intervening cause, appellant relies on testimony of Fritz Wanzenberg, an expert witness, who testified on behalf of the Wallaces that Oakley had told him that the safety shields self-destructed after a few uses. Larson argues that this shows that Oakley knew shortly after he purchased the machines that the safety shields were missing and that, knowing for months that the shields were missing, he continued to provide the machines for his customers' use. The cause of the injury, according to Larson, was Oakley's failure to replace the shields and Oakley's loan of the fertilizer spreader to Wallace was an efficient, intervening cause.

Larson also relies on *Cowart* v. *Jones,* 250 Ark. 881, 467 S.W. 2d 710. The question there was different from that posed here by Oakley. Assuming that the evidence is sufficient to show that the safety shield was defectively designed and manufactured, the basic question is whether the actions of Oakley in furnishing the spreader to his customers without the safety shield were foreseeable by Larson. In *Cowart,* we held that the continued use of a crane by a lessee of that equipment with the knowledge that it lacked certain safety devices was a separate and intervening cause of fatal injuries to an employee of the lessee in an action against the lessor. There, in sustaining a directed verdict for the lessor, we pointed out that the equipment had been in the lessor's possession for three or four weeks, that the crane had been assembled on the job site and operated by the lessee and the lessor had exercised no control over the operation of the crane by the lessee, that the lessee was aware during his use of the crane that the safety devices were not on the crane, and that it was customary to take a precautionary measure in the

absence of these safety devices. There are many similarities here. As will be seen, a critical factor there was the lessee's knowledge of the lack of safety devices and his use of the equipment in disregard of that hazard. See *Arkansas Kraft Corp.* v. *Johnson,* 257 Ark. 629, 519 S.W. 2d 74. The intervention of an intelligent and responsible human being is an appropriate consideration. See *Southwestern Bell Telephone Co.* v. *Adams,* 199 Ark. 254, 133 S.W. 2d 867; *Pittsburg Reduction Co.* v. *Horton,* 87 Ark. 576, 113 S.W. 647, 18 LRA N.S. 905. We did not go into the question of foreseeability in *Cowart,* but we did cite both *Hartsock* v. *Forsgren,* 236 Ark. 167, 365 S.W. 2d 117, and *Collier* v. *Citizens Coach Co.,* 231 Ark. 489, 330 S.W. 2d 74, as authorities supporting our treatment of the question of proximate cause. Both consider that question. Furthermore, there was evidence in the case indicating that it was the custom in the trade for lessees of cranes lacking the safety devices to compensate by use of other devices and practices.

The question of foreseeability is material in determining the question presented here. We have taken the position, in reliance upon a statement of the rule in *Cooley on Torts,* that in no case is the connection between an original act of negligence and an injury broken by an intervening act of negligence of another if a person of ordinary sagacity and experience, acquainted with all the circumstances, could have reasonably anticipated that the intervening event might, not improbably, but in the natural and ordinary course of things, follow his act of negligence or if the misconduct is of a character which, according to the usual experience of mankind, is calculated to invite or induce the intervention of some subsequent cause, an intervening cause will not excuse the original misconduct but will be held to be the result of it, and that the original act or omission will not be considered too remote to be a proximate cause if, according to the usual experience of mankind, the result ought to have been apprehended; and that the test is in the probably injurious consequences which were to be anticipated, not in the subsequent event and agencies which might arise. *Southwestern Bell Telephone Co.* v. *Adams,* supra. See also, *Arkansas Kraft Corp.* v. *Johnson,* supra. The intervening act or omission of a third person is not a superseding cause when the original actor's negligent conduct is a substantial factor in bringing about an injury, if the actor, at the time of his negligent conduct realized that a third person might so act or if the intervening act is a normal response to a situation

created by the actor's conduct and the manner in which it is done is not extraordinarily negligent. *Hill* v. *Wilson,* 216 Ark. 179, 224 S.W. 2d 797.

Certainly Oakley was an intelligent adult. There is evidence that he knew that the safety shield was made of thin, flimsy plastic that would remain on the power take-off shaft until it was bent "or something like that" and that it "wouldn't stay one trip to the field." He did not know whether the shaft had a shield on it when Wallace picked up the spreader, but did know that he had been unable to keep these shields on the equipment in the past. Fritz Wanzenberg, an expert witness called by appellees, testified that Oakley told him that, "to the best of his knowledge," the safety shield had been removed because it self-destructed while he had it "in his own cognizance." Wanzenberg also testified that Oakley had said that these safety shields could self-destruct and that one of them had.

Oakley testified that, at the beginning of the 1973 season, there were safety shields on the power takeoff shafts on the two Larson fertilizer spreaders he had purchased in 1972, and that he had never replaced the power take-off shafts on either. He did not recall the conversation with Wanzenberg, but would not deny that it had occurred. He did testify that he had not told anyone that the shields melted. He did say that these shields will "bust" if they hit something. He denied that he had ever told anyone that there was not a shield on the particular implement he let the Wallaces have at the time it left his place of business. He said that he occasionally inspected equipment loaned to purchasers of fertilizer, in keeping with custom in the business, when it was returned. Oakley stated that if he were buying a power take-off shield, he would buy a metal one.

It is not possible for us to say that Larson could have reasonably foreseen that the fertilizer spreaders it sold to Oakley would have been furnished to farmers without any safety shields on them. Yet the jury had to find Oakley did so, or Oakley could not have been guilty of negligence. We find that Oakley's negligence was an efficient intervening cause

and that the verdict against Larson must be reversed for that reason. G & G is also entitled to a reversal of the judgment against it on the question of intervening causes.

This brings us to the question whether Oakley is entitled to a judgment over against Larson and G & G. Oakley contends that the trial court erred in refusing to grant a judgment over against Larson and G & G in his favor and to conform the judgment to the jury verdict, which contained a finding that Oakley had not breached any warranties to Arnold Wallace and that his negligence was less than that of Larson and G & G. The case was submitted to the jury on interrogatories. Wallace, Larson, G & G and Oakley were all found to be guilty of negligence which was the proximate cause of the "occurrence." The jury also found that both Larson and G & G had breached implied warranties of merchantibility and of fitness for a particular purpose, but found that Oakley had not breached either implied warranty. The jury found that Arnold had sustained damages of $180,000 but that his wife Vada had not sustained any damages.

Oakley contends that, on the face of the verdict, the jury plainly found in his favor on his "counterclaim" against the other two defendants. Oakley had filed such a pleading, alleging that the shield was defectively manufactured and designed and constituted a breach of implied warranty of fitness for a particular purpose. He also alleged that G & G failed to test and inspect the safety shield and failed to provide adequate warning to all the parties involved and that Larson manufactured and distributed the product which included the safety shield and knew, or should have known, of the potential hazards involved. He prayed for judgment over against both Larson and G & G for indemnity and for contribution. Oakley moved for judgment on his counterclaim and total indemnification for all sums he would otherwise be required to pay to appellees. The court entered judgment against Oakley, Larson and G & G, jointly and severally, for $108,000, being the remainder after deducting 40% of the verdict for damages because of Wallace's own negligence.

Oakley is not entitled to contribution from Larson and G & G, in the view we take of the case, because Oakley, Larson

and G & G are not joint tortfeasors and do not share a common liability. *C & L Rural Electric Cooperative Corp. v. Kincaid,* 221 Ark. 450, 256 S.W. 2d 337. Although Oakley seeks here to have contribution from Larson and G & G under Ark. Stat. Ann. § 27-1763 et seq (Repl. 1979) on the basis of comparative fault, he did not seek recovery on that basis in the trial court. Since this issue is raised for the first time on appeal, we do not consider it. *Dunkum v. Moore,* 265 Ark. 544, 580 S.W. 2d 183. The question then is whether Oakley is entitled to be indemnified by Larson or G & G, or both. Oakley's motion was based on both negligence and breaches of warranties, reiterating the allegations of defective design, breach of implied warranty of fitness for a particular purpose, improper testing and inspection, and inadequate warnings made in his counterclaim.

There was no express contract for indemnity by either Larson or G & G, and Oakley does not so contend. The basis for the right to indemnity in a case where there is no express contract therefor is liability upon an implied contract or quasi-contract. *Ingram v. Smith,* 16 N.C. App. 147, 191 S.E. 2d 390 (1972), cert. den. 282 N.C. 304, 192 S.E. 2d 195; *Rieger v. Frankstram Realties, Inc.,* 68 N.Y.S.2d 243 (1946). Indemnity may be permitted where the indemnitor has breached a duty of his own owed to the indemnitee. *Williams v. Johnston,* 92 Idaho 292, 442 P. 2d 178 (1968). Cf. *Jack Morgan Construction Co. v. Larkan,* 254 Ark. 838, 496 S.W. 2d 431; *Oaklawn Jockey Club, Inc. v. Pickens-Bond Construction Co.,* 251 Ark. 1100, 477 S.W. 2d 477.

The right to indemnity, where one of the parties is not liable to the injured party for a joint wrong, must be based upon a relationship other than that of joint tortfeasors. *Welter v. Curry,* 260 Ark. 287, 539 S.W. 2d 264; *Jack Morgan Construction Co. v. Larkan,* supra. But it may arise from a special relationship between the parties. *Dulin v. Circle F. Industries, Inc.,* 558 F. 2d 456 (8 Cir., 1977). See also, *Southern Farm Bureau Cas. Ins. Co. v. Gooding,* 263 Ark. 435, 565 S.W. 2d 421; *Voss v. Arthurs,* 129 Ark. 143, 195 S.W. 680. Of course, it is a legal relationship that is required. *Millenson v. Dept. of Highways,* 41 Colo. App. 460, 590 P.2d 979 (1978). It has been appropriately said that the doctrine of indemnity is bas-

ed upon the equitable principles of restitution which permit one who is compelled to pay money, which in justice ought to be paid by another, to recover the sums so paid unless the payor is barred by the wrongful nature of his own conduct. *Lunderberg* v. *Bierman,* 241 Minn. 349, 63 N.W. 2d 355 (1954); *AID Insurance Services* v. *Riley,* 25 Ariz. App. 132, 541 P. 2d 595 (1975). See also, *Orton* v. *Markward and Karafilis, Inc.,* 83 Mich. App. 548, 269 N.W. 2d 219 (1978); Restatement of the Law, Restitution, § 76; 1 Dooley, Modern Tort Law 547, § 26.07 and Supp. 1979; *Tolleson* v. *Jennings,* 60 Ark. 190, 29 S.W. 276; *Southern Farm Bureau Can. Ins. Co.* v. *Gooding,* supra; *C & L Rural Electric Cooperative Corp.* v. *Kincaid,* 221 Ark. 450, 256 S.W. 2d 337.

Oakley based his claim for indemnity upon breaches of implied warranties to him by Larson and G & G. There was no error in the denial of Oakley's motion for judgment because it was premature. We held long ago that no right of action on a contract for indemnity accrues until the indemnitee is subjected to damage on account of his own liability. *Carter* v. *Adamson,* 21 Ark. 287. The rule that one complaining of the breach of a contract of indemnity must, in order to be entitled to recover from the indemnitor, show that he has paid the obligation in controversy, seems to be well settled. *Latimer* v. *Texas & N.O. R. Co.,* 56 S.W. 2d 933 (Tex. Civ. App., 1933). See also, *Celeste* v. *Prudential-Grace Lines, Inc.,* 358 N.Y.S. 2d 729, 315 N.E. 2d 782 (1974). There must be loss, not merely liability, before indemnity is due. *Schubert* v. *August Schubert Wagon Co.,* 249 N.Y. 253, 164 N.E. 42 (1928). No money judgment may be rendered for indemnity until the party seeking indemnity has suffered an actual loss. *Board of Education, School Dist. 16* v. *Standhardt,* 80 N.M. 543, 458 P. 2d 795 (1969)[2]

The fact that there is no express contract for indemnity here does not matter, insofar as the accrual of the cause of action is concerned. It is a general rule of law that the indemnitee on an implied covenant for indemnity against loss or damage cannot recover from the indemnitor upon a mere

---

[2] This case was treated on a second appeal and a judgment was again reversed on other grounds sub. nom. *Standhardt* v. *Flintkote Co.,* 84 N.M. 796, 508 P. 2d 1283 (1973).

showing that the indemnitee has incurred liability, but he must show that he has suffered actual loss by payment or satisfaction of a judgment or by other payment under compulsion. *Faulkner* v. *McHenry,* 235 Pa. 298, 83 A. 827 (1912); *St. Paul Fire & Marine Ins. Co.* v. *Thompson,* 152 Mont. 396, 451 P. 2d 98 (1969); *Ingram v. Smith,* 16 N.C. App. 147, 191 S.E. 2d 390 (1972), cert. den. 192 S.E. 2d 195. See also, *Beights* v. *W. R. Grace & Co.,* 282 N.C. 304, 62 F.R.D. 546 (W.D. Okla., 1974). A cause of action for indemnification, in the absence of a specific contract providing otherwise, does not accrue until payment has been legally made by the indemnitee. *District of Columbia* v. *D. C. Transit System, Inc.,* 248 A. 2d 184 (D.C. App., 1968); *Milstein* v. *City of Troy,* 272 App. Div. 625, 74 N.Y.S. 2d 892 (1947); *Sheftman* v. *Balfour Housing Corp.,* 30 Misc. 2d 924, 219 N.Y.S. 2d 361 (1961). See also, *Beights* v. *W. R. Grace Co.,* 282 N.C. 304, 62 F.R.D. 546 (W.D. Okla., 1974).

We have heretofore intimated that the right to a money judgment for indemnity against a manufacturer does not exist until the party seeking judgment has paid the judgment. *Burks Motors, Inc.* v. *International Harvester Co.,* 250 Ark. 641, 466 S.W. 2d 943.

The failure of one seeking indemnity to pursue his right by third party pleading bringing in a new party would not preclude him from subsequently maintaining an action. *C & L Rural Electric Cooperative Corp.* v. *Kincaid,* supra. It was appropriate, however, for a third party complaint (or cross-complaint) for indemnity to be served on a party to the action before the cause of action accrues, to avoid a multiplicity of actions. *Sheftman* v. *Balfour Housing Corp.,* supra; *Morey* v. *Sealright Co.,* 41 Misc. 2d 1068, 247 N.Y.S. 2d 306 (1964); *Board of Education, School Dist. 16* v. *Standhardt,* 80 N.M. 543, 458 P. 2d 795 (1969); *Beights* v. *W. R. Grace & Co.,* supra.

Inasmuch as Oakley moved prematurely for judgment for indemnity, we find no error in the denial of his prayer for judgment over against Larson and G & G, but remand the case for determination of the question of Oakley's entitlement to such a judgment, when and if he pays the judgment in favor of Wallace.

The judgment in favor of Wallace against Oakley is affirmed. The judgments against Larson and G & G are reversed. The cause is remanded for further proceedings with reference to Oakley's claim for indemnity.

HICKMAN, STROUD and MAYS, JJ., not participating.

Supplemental Opinion on Rehearing
delivered April 28, 1980

JOHN A. FOGLEMAN, Chief Justice. Appellee Arnold Wallace and the appellant Bruce Oakley have filed their petitions for rehearing herein. The petition of Arnold Wallace is denied. We find no merit in the petition of Bruce Oakley in any particular except one. Oakley calls our attention to the fact that after Larson Machine Company, Inc. and G & G Manufacturing Company are eliminated from the case on the ground that a verdict should have been directed in their favor, the apportionment of negligence made by the jury is no longer applicable. So long as Larson and G & G were parties, Wallace was entitled to recover his damages from any of the three parties found negligent, even though he was more negligent than any one of them, but his negligence was less than 50 percent of the total negligence. See *Walton* v. *Tull,* 234 Ark. 882, 356 S.W. 2d 20, 8 ALR 3d 708; *Riddell* v. *Little,* 253 Ark. 686, 488 S.W. 2d 34; *Wheeling Pipe Line, Inc.* v. *Edrington,* 259 Ark. 600, 535 S.W. 2d 225. When Larson and G & G were eliminated, it would appear that Wallace was more negligent than Oakley. Still, we cannot say on the basis of this jury verdict that Wallace was guilty of more or less than 50 percent of the total negligence and we are unwilling to say

that simply because his negligence exceeds that attributed to Oakley by the jury, that Oakley is entitled to a dismissal. In other words, we cannot automatically translate the jury verdict into a finding that Wallace's fault amounted to 80 percent and Oakley's to only 20 percent. See *Fitzhugh* v. *Elliott,* 237 Ark. 88, 371 S.W. 2d 533.

It must be remembered that the comparison made by the jury was on the basis of fault rather than negligence. Wallace's fault was based only on negligence, as was Oakley's. On the other hand, the fault apportioned to Larson and G & G was based upon both negligence and breach of warranty. Thus, if fault based upon breach of warranty had been eliminated when the question went to the jury, we can only speculate as to how the jury might have apportioned fault between Wallace and Oakley. This only further complicates the matter, and it can only be satisfactorily resolved by a reversal of the judgment against Oakley and a remand of the case to the circuit court for retrial. To that extent Oakley's petition for rehearing is granted. In all other respects, that petition for rehearing is denied.

HICKMAN, STROUD and MAYS, JJ., not participating.